### Wytheville.

### BOYD & OTHERS *v.* CLEGHORN & OTHERS.

#### July 8, 1897.

#### Absent : BUCHANAN, J.*

1. APPEALS—*Correct decree—Wrong reasons assigned.*—If the decree of the trial court is right, this court will affirm it, though it does not approve the reasons assigned by the trial court.
2. SPECIFIC PERFORMANCE—*Parol contract for sale of land—Statute of frauds—Evidence.*—Notwithstanding the statute of frauds, courts of equity, in order to defeat a fraud, will compel the specific execution of a parol contract for the sale of lands if the contract is established by clear and convincing proof. In the case at bar the evidence is not of that clear and convincing character necessary to entitle appellants to the relief sought.

Appeal from a decree of the Circuit Court of Smyth county, pronounced September 14, 1896, in a suit in chancery wherein the appellants were the complainants, and the appellees were the defendants.

*Affirmed.*

The opinion states the case.

*White & Penn* and *B. F. Buchanan*, for the appellants.

*Dickerson & Goodell, Geo. W. Richardson* and *J. H. Gilmore*, for the appellees.

HARRISON, J., delivered the opinion of the court.

This court does not concur in the reasons assigned by the Circuit Court for rendering the decree complained of. If,

---

* Judge Buchanan had been counsel in the Circuit Court.

however, that decree appears to be a proper one for other reasons, it will be affirmed. *Newell* v. *Wood*, 1 Munf. 555.

The object of this suit is to enforce specific performance of two parol agreements for the sale of land, one alleged to be with the father of the two female appellants, and the other between his alleged vendors and those from whom said vendors purchased.

It appears that the thirteen acres of land in controversy were patented in 1842 to Charles Talbert; that it was extremely poor, of very little value, and only suited for an humble home for persons of very small means. It further appears that in 1861 the heirs of Charles Talbert sold this land to Charles Cleghorn and William Shannon, and delivered to their vendees the patent which had been issued to their father, but that no deed of conveyance or contract in writing was executed as evidence of the purchase. It further appears that at the time of this transaction David Allison was in possession of the land, occupying it as a home for himself and family, and that very soon after the purchase by Cleghorn and Shannon said Allison paid them for the land $200 in Confederate money as the full purchase price asked by them, and received from them the patent of 1842; that no deed or contract in writing was executed as the evidence of this sale. It further appears that David Allison continued to occupy this land as his home, with a large family of sons and daughters until the day of his death in 1889; that his children have continued to occupy the same since his death; and that in 1883 David Allison obtained from the Talbert heirs a deed conveying him the legal title which was duly recorded.

It further appears that in 1861 William Allison, one of the sons of David, who at the time was not more than twenty-one years old, enlisted and left home as a soldier in the Confederate service, leaving a wife and two children, the female appellants, with his father; that shortly afterwards William was killed; that his widow and two children continued to live

with David Allison until 1867, when she married again, and moved with her two children to live with her second husband. These two children of William Allison, who are now married women, bring this suit, making the heirs of Charles Talbert, the heirs of David Allison, the heirs of William Shannon and Charles Cleghorn parties defendant, and allege that their father, William Allison, bought this land from Cleghorn and Shannon; that he sent the money from the army to David Allison to pay for it; that when David Allison paid over the money and received the patent it was as agent for their father; that David Allison had peen permitted to occupy the land as a home during his life time without charge; and that in securing the deed in 1883 from the Talbert heirs David Allison had committed a fraud upon the rights of appellants, and that any title so acquired inured to their benefit; and that they have the right to demand from the heirs of Charles Talbert, the heirs of William Shannon, and from Charles Cleghorn, a deed conveying them the legal title to the land, and the right to have the deed executed to David Allison by the Talbert heirs declared fraudulent and void, or a decree declaring the title thus acquired to inure to their benefit.

The heirs of David Allison answer this bill, and broadly and flatly deny its allegations, and positively assert that their father was the true and lawful owner of the land, had paid for the same with his own means, and had occupied it for thirty years without a whisper against his title from any source; that since his death it had been continuously occupied by his heirs; that they had erected numerous buildings upon it, and that all this had been done in the presence of appellants, and without objection from them. That David Allison, finding that the legal title was outstanding in the Talbert heirs, had in 1883 gotten from them a deed of conveyance for the land; that this was done at his own expense and for his own benefit, and was not done, as alleged, to defraud his grandchildren.

Equity will at all times lend its aid to defeat a fraud, notwithstanding the statute of frauds, yet to justify the court in relaxing the operation of the statute, and in compelling the specific execution of a verbal contract for the sale of land, clear and convincing proof is essential, otherwise the desire to prevent fraud might result in great wrong and injustice to him who has the lawful right, and thus the prime object of the statute be defeated. *Wright* v. *Puckett*, 22 Gratt. 370; *Pierce's Heirs* v. *Catron's Heirs*, 23 Gratt. 588; *Hale* v. *Hale*, 90 Va. 728; *Darling* v. *Cumming*, 92 Va. 521.

The evidence in the case at bar is not of the clear and convincing character that is necessary to entitle appellants to the relief sought. It consists chiefly of alleged verbal declarations and admissions made by David Allison many years ago which cannot be contradicted or explained, now that he is dead, and the slightest mistake or failure of recollection might totally alter the effect of such declarations. Such evidence is always extremely unsatisfactory.

The payment of the purchase money by David Allison, his long uninterrupted possession, and that of his heirs since his death, with the full knowledge and acquiescence of appellants, the improvement of the property without objection by them, the acquisition and recordation of the legal title by David Allison in 1883, are circumstances of too much weight and consequence to be overcome by the evidence in this case tending to sustain the allegations of the bill.

For these reasons we are of opinion that there is no error in the decree appealed from to the prejudice of appellants, and it must be affirmed.

CARDWELL, J., dissenting:

The bill in this cause was filed by the heirs at law of William Allison, deceased, to extract the title to the thirteen acres of land in question from the heirs at law of David Allison, deceased. The heirs of Charles Talbert, deceased, while

<hr>

made parties to the suit, have no interest in the land, and therefore it is not for the purpose of enforcing two parol agreements for the sale of the land that this suit is brought.

The opinion of the court concedes that if the evidence was clear and convincing that William Allison paid the purchase money for the land, appellants, complainants in the court below, would be entitled to the relief they ask.

I am of opinion that this fact is shown by clear and convincing testimony, and that the deed obtained by David Allison from the Talbert heirs in 1883 was in fraud of the appellant's rights, and that the evidence relied on by appellants does not "consist chiefly of alleged declarations and admissions made by David Allison many years ago which cannot be contradicted or explained."

The land was bought by Charles Cleghorn of the heirs of Charles Talbert, deceased, for himself and his partner William Shannon, about 1861. The Talbert heirs did not make to Cleghorn and Shannon a deed for the land, but delivered to Cleghorn a patent from the Commonwealth to Charles Talbert for the land, issued in 1842. After this purchase, by the permission of Cleghorn, David Allison went upon the land and was living on it in 1862, when Cleghorn sold it to William Allison, David Allison's son, for $200. A short time after this sale was agreed on, William Allison went to the army, leaving the money to pay for the land with his father, David Allison, and when Cleghorn got the money from David Allison and turned over the patent to him for the benefit of William Allison, David Allison told him that it was William Allison's money; that he had no claim whatever to it; that it was simply left with him to be paid over, and that all the claim he, David Allison, had was to a home on the land for himself and wife during life, and at their death the land was to go to William Allison's wife and children. These facts are testified to by Cleghorn, who says further that when William Allison went

to the army, he bought this land as a home for his wife and children; that at that time he had one child, but the second was born shortly after; that William Allison was killed in battle in 1863; that his wife and children lived on the land till 1867, when the wife married again, and, with her children moved to the home of her second husband, leaving David Allison and wife living on the land, where the former died in 1889, and the latter in 1891; that witness often heard David Allison repeat that the land belonged to his son William's children, and never heard anything to the contrary until after both David Allison and his wife had died, and the heirs of David Allison wanted a partition of the land.

An effort was made to impeach this witneess, but it signally failed, and a number of respectable citizens testify to his standing in the community as a man of integrity and veracity.

Other witnesses testify that they had heard David Allison say that the land belonged to his son William's children. One of these witnesses says that while boarding at the house in 1866 and doing some work in the neighborhood, and while William Allison's two children were small, something was said about the land, and David Allison putting his hand upon the head of one of the William Allison children said: "It belongs to these two children." Both of these children have testified in this case, and say that their grandfather often told them that the land belonged to them; he only claiming the right of himself and wife to live thereon for life.

True, it is said by other witnesses that they heard David Allison say that the land belonged to him, but if he in fact so stated, I apprehend that such declarations in his own interest are entitled to but little weight, if any.

It is not till after it appeared that the land was becoming more valuable, that we find David Allison in company with his son-in-law getting from the heirs of Charles Talbert, in 1873, an agreement to convey their interest in the land to him in consideration of $2 to be paid to each. In 1883 the

deed from the Talbert heirs to David Allison was obtained, and a witness, B. F. Call, who for twelve years held the office of commissioner of the revenue for the county of Smyth, in which this land is situated, testifies that David Allison asked him to take the deed to the courthouse to be recorded, and, in a conversation then had between them, David Allison told witness that William Allison furnished the money to pay for the land. The proof does not show that the appellants were apprised of any claim of interest in this land by the children of David Allison till some time after the death of David Allison's widow in 1891, when it was desired to have a partition of the land. Then we find the children of David Allison so anxious for a partition, that they are unwilling to wait till it could be settled by the courts as to whom the land belonged, and induced appellants to sign an agreement to partition the land, but which they would not sign till a provision was inserted that the agreement should not interfere with any right or claim of appellants to the land; and notwithstanding this proviso in the agreement under which the land was partitioned, appellees, children of David Allison, set up as a defence to this suit that appellants were estopped from claiming the land by the agreement they had signed for it to be partitioned, and the court below so held.

I recognize fully that the law is well settled that testimony upon which a parol agreement for the sale of land will be enforced must be clear and convincing, but it is clear to me that the evidence in this case establishes the fact that William Allison purchased the land in question; paid the purchase price therefor; that David Allison recognized the rights of William Allison's children to the land, and that if he did not regard the deed obtained from the Talbert heirs in 1883 as serving only to debar their claim, if any, to the land, but intended thereby to take title to the land in himself to the exclusion of William Allison's children, the taking of this deed was in fraud of their rights and should have been so held.

*Affirmed.*