# Staunton

## Lenore daCruz Jacobs v. Benjamin L. Jacobs.

September 5, 1945.

Record No. 2928.

Present, Campbell, C. J., and Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*Harry A. Grant,* for the appellant.

*R. O. Norris, Jr., Christopher B. Garnett* and *F. V. Watkins,* for the appellee.

SPRATLEY, J., delivered the opinion of the court.

This case is here to review a decree annulling a marriage and declaring void a conveyance of real estate from the appellee to the appellant upon the ground that the appellant fraudulently induced the appellee to marry her and convey to her the real estate in consideration of the marriage, when, at the time of the marriage and conveyance of the property, the appellant had a preconceived intention not to consummate the marriage, and in pursuance of which intention the marriage was not consummated.

No question of equitable jurisdiction is involved. In *Pretlow* v. *Pretlow,* 177 Va. 524, 14 S. E. (2d) 381, Mr. Justice Holt reviewed and analyzed many of the cases and authorities, American and English, dealing with the jurisdiction of courts of equity to annul a marriage where assent thereto was induced by artifice or gross fraud, and firmly declared courts of equity in Virginia to be vested with such jurisdiction.

The historical facts are as follows:

On May 21, 1940, Benjamin L. Jacobs, who was then 79 years of age, married the appellant, Lenore daCruz, who was then 42 years of age. By deed dated June 27, 1940, Jacobs conveyed to his wife for the stated consideration of $10, a house and lot valued around $9,000, located in Arlington county, Va. The deed contained the following provision: "This conveyance is made subject to the restrictions of record, and to a reservation of a life interest in Benjamin L. Jacobs in said property for use as a home". The deed was signed by both of the parties and acknowledged by each of them on July 1, 1940, and recorded on July 12, 1940.

Appellee filed his bill on December 7, 1942, in which he set out that although Mrs. Jacobs "conducted herself

amiably and properly toward complainant during the first few weeks of their marriage", she was not affectionate towards him and that, after the execution and delivery of the deed, she "began to and has ever since consistently mistreated complainant and failed and refused to conduct herself as a wife", treating him with extreme cruelty, "abusing and cursing him in the vilest language and physically assaulting him"; that the only purpose of the appellant in marrying him was to get possession of his property; that she had no intention at the time of the marriage or at the time of receiving the deed of acting as his wife; and that the consideration for the conveyance of the property has failed. He prayed for annulment of the marriage and a reconveyance of the property on the ground of fraud, and if an annulment of the marriage should be denied that a divorce *a mensa et thoro* be decreed him on the grounds of cruelty and desertion. Appellant answered, denying the material allegations as to fraud, non-consummation of the marriage and misconduct on her part, and by way of cross-bill set up a claim to affirmative relief and prayed for a divorce *a mensa et thoro* on the ground of wilful desertion and abandonment by the appellee.

The trial court referred the cause to a commissioner in chancery to ascertain whether the appellee was entitled to have the marriage annulled or to have a divorce *a mensa et thoro*, and whether the deed conveying his real estate to the appellant should be declared null and void.

Jacobs gave his testimony by depositions out of the presence of the commissioner. All other witnesses testified in his presence. The commissioner concluded and reported that the marriage should be annulled and that the appellee was entitled to recover his property.

Numerous exceptions were taken by Mrs. Jacobs, the principal one being that the evidence did not support the findings of the commissioner. The trial court on June 2, 1944, approved and confirmed the findings of the commissioner, and thereupon entered a decree annulling the

marriage and directing a reconveyance of the described property to the appellee. From this decree the appellant appealed.

A correct decision in the case depends entirely upon the question whether the evidence is sufficient to support the decree. A large portion of the testimony relates to the causes for divorce alleged in the bill. Since the decree granted an annulment of the marriage, not a divorce, the evidence relating to divorce will be considered only so far as it may be said to indicate or reflect the intention of the appellant in contracting and entering into the marriage. The right of either party to a divorce is not before us for review, and we will give it no consideration.

In the consideration of the evidence it is well to remember the rule of universal recognition, that where fraud is relied upon the burden of proof is upon the one alleging it, and that if it is not strictly and clearly proven as alleged, by circumstantial or direct evidence, no relief will be granted.

At the time of his marriage to the appellant Jacobs was a retired government employee. He had formerly been a clerk in the office of the Chief of Finance, U. S. War Department, Washington, D. C. He was drawing retirement pay of $100 per month. The only property he owned was his home (the house and lot he conveyed to Mrs. Jacobs), and a small bank account. He was indebted to a relative in the sum of about $900, which under pressure by the creditor he was repaying at the rate of $25 per month. He had been married twice before. His first wife died shortly after their marriage and his second wife in 1939. He had no children.

In the fall of 1939 Jacobs became seriously ill with uremic poisoning, occasioned by an enlargement of the prostate gland. He was admitted to Georgetown hospital in Washington, D. C., on October 5, 1939. After the removal of his prostate gland his physical condition became much improved. While in the hospital Jacobs was attended by three nurses, one of whom was Mrs. Lenore daCruz. He apparently became interested in her at that time, his surgeon recalling that Jacobs made some statement to him about liking

one of his nurses. The surgeon thought that as a result of the operation the chances were that his patient's sexual virility was somewhat impaired, but that there frequently occurred in such cases delusions of increased vitality.

Jacobs was discharged from the hospital about November 1, 1939, and he immediately returned to his home. Three months later, after making some inquiries, he ascertained the address of Mrs. daCruz, and visited her at the home of her sister in the District of Columbia. It is conceded by counsel for each of the parties that thereafter his courtship of the lady waxed fast and furious. The ardor and intensity of his wooing is shown by a series of affectionate and endearing letters from Jacobs importuning marriage, and offering his property as a gift to induce her acceptance of his proposal. His attitude and state of mind towards the appellant is best evidenced by the following extracts from his letters.

On March 23, 1940, addressing her as "Dear Mrs. daCruz," he said: "The other day when I 'phoned you, you did not appear quite natural but cut me off before I finished. You remember that I said when you are about to come out here (Which I hope will be real soon) if you will advise me that I will meet you in Georgetown and accompany you in order that you would not have to pick your way to a strange place and intended to add that I wished you to have lunch with me.

"Please do not forget your promise to come, so make it snappy, see.

\*         \*         \*         \*         \*         \*         \*

"Hoping to see you this coming week, I am

Sincerely

Ben".

On March 26, 1940, he wrote: "My dear Lenore; \* \* \*

"Here, this morning, am in a piteous condition, not from any ill effects from my pleasant outing, very lonely and nervous with no one to console me, except pups who seems to sense something is wrong.

"Lenore, apparently you consider there is a great barrier between us. This is my reaction or complex as you did not go into the matter at all, but left it with my present feeble imagination.

"Of course I had every reason to believe that your husband had died, however, I cannot see any justification in a case, when after marriage a young couple find that they had made a mistake and is confronted by irrevocable incompatibility why two lives should be destroyed. I do not approve of divorces by any means, but sometimes it becomes almost a necessity or in other words a blessing.

"Lenore, I want you and I need you badly. Do you think it is possible to see your Cardinal or Bishop and obtain (under the circumstances) a special dispensation or have your divorce annulled? I understand that your wedding ceremony was not performed by a Catholic priest. Is there any hope for poor me?

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

"I just noticed that I began this note with 'My dear Lenore' which is a prevarication, unless you give me the permission. How about it?

"I am so full of thoughts of you that I cannot write nor spell, so please pardon imperfections.

"I expect to have to go to the City tomorrow, but do not know just what time. May not be able to resist the temptation to see you at the hospital corner. This is not any sixteen year old boy's case either. Presume you will reach the corner about two thirty.

"Very sincerely yours,

Ben".

On April 9 he wrote in part: "My dear sweetheart Darling":

"Well I suppose that I might as well tell you what is in my mind and get it out of my system, so here goes.

"Darling if you think that you can give me a little affection (I know that I will try very hard to increase it to love) and will marry me very soon, I will give you a deed

for this property which would be considered a very good business transaction, but is of course based on affection and love, and I do not consider the business angle at all. I am desperate and must have you. The property is sure to increase in value.

"This section is conceded by those who know to be the best suburb of Washington. When I pass on you would still have a home that is convenient to the hospital without having to go away out in Maryland be by yourself.

"You remember that I told you that you need not give up your profession. You would save your rent and could save for the boys or for yourself. My wants (aside from the one want) are very few and I believe that I would be able to provide the food and take care of the house. Darling it all looks so easy to me and do not see how it interferes with your responsibilities that you mentioned.

"The reason I mentioned, in my last letter, your marrying was because I thought it would be the means of getting you away from out in the country, where I think you are the larger portion of the time alone.

"Darling, it worries me nearly to death and is a regular nightmare to me. I am afraid I almost idolize you, precious.

"Lenore, please give this note serious consideration and tell me O. K. the next time you see me, and I will be waiting anxiously.

"Your true lover,

Ben".

On April 19, 1940, addressing her as "My dear darling little Girl", he said:

"I am of a very sensitive disposition and feel deeply hurt. Why? At the Raleigh the other morning you said, in effect, that my love for you was imagination or something else. How can it be such? when I idolize you and worship the ground you walk on and am miserable when you are out of my sight. Why do I run after you so incessantly and daily crave the opportunity or excuse to go to your home? How, sweetheart, can any one conceive the idea that my love for you is imagination?

"You remember, at the Raleigh, I said that delay would or could not benefit me and that you said that you were getting nervous or something of that kind and reiterated that September would suit you better and I, as usual, raised no objection, although it deprives me of five and one half months companionship, which I begrudge.

"I was awfully glad to hear that sweet voice this morning and wanted to call you but you said that I should come down on earth and be rational. Darling, do not think that I am weak, because I have an indomitable will and may sometimes may be considered bull-headed but I could never exercise it against my unspeakable love for you, Lenore.

\* \* \* \* \* \* \*

"Honey, it is all over the neighborhood that I am going to be married. I told Dr. Jones in church last Sunday as the people were going out and some one over heard and blabbed it. Nearly every one I meet speak of it to me and look as if they wanted me to say when, but nothing doing. Don't think it will be long before some one will have the audacity to ask me. I will simply say O some of these times.

"Darling, I suppose you will say to yourself, how silly, when you read this note. Well sweetheart I do not think it is silly to write or think about you because I could not think of a sweeter, nicer and dearer little girl in many days travel. You are my sunshine and my happiness, no kidding.

"Hoping to see you, darling real soon I am as ever and always will be (don't you believe it now).

"Yours devotedly

Ben".

In an undated letter he expressed his feeling as follows: "My dear little Girl:

"It is quite late and have been looking at church money so much to-night until I have become almost dizzy so concluded to quit and write you a little note.

"Suppose that you are snugly curled up in your little bed, if not, you should be, but could not resist writing to you to ask a question which would make me feel much better and more secure.

"This afternoon you particularly stressed 'waiting until September, intimating, only, that you would marry me at that time. Sweetheart—don't you think that you could tell me plainly that we are engaged and will be married in Sept? That is such a long time to wait and what I would greatly prefer is to step up to Rockville and be married quietly and just let things go as they are now, until Sept. Then I would know that no one could take you from me. Would promise not to mention it to any one. Do you think you could do that? Hear you saying, 'No we had better wait'.

"I am not usually curious, but would like to know what your sister and Pete said to you, see.

"Sweetheart, I was so very afraid that you would take cold, going around all the afternon without stockings. Please take care of yourself and not be imprudent and not work so hard about the house.

"I wish to tell how much I enjoyed being with you to-day (but could have enjoyed it more) and let me know when I can come again, but do not make it long, because I am in a hurry. Wish that I could sneak up and kiss you, not once but several times.

"Am going to say good morning and sneak up stairs, and probably due to the late hour I *me* be able to get some sleep.

"Lovingly,

Ben".

As a result Jacobs and Mrs. daCruz undertook to obtain a marriage license from the clerk of the Circuit Court of Montgomery county, Maryland. There was a delay of a few days until Mrs. daCruz procured a certified copy of the divorce decree from her first husband. The license issued on May 14, 1940. Thereafter, on May 21, the two were married at Rockville, Maryland. From that time on the evidence is in conflict as to their relations.

It seems to have been agreed between the newly married couple that on account of the need to repair the house of

Jacobs his wife would not move permanently to that place as her home until the completion of the repairs. She accordingly lived at the residence of her sister, in the District of Columbia, most of the time during the period of renovation, visiting, from time to time, the home where her husband lived. She replaced some of the furniture in their joint home with some of her own and moved permanently to this home on August 18, 1940.

In the direct examination of Jacobs occurs the following:

"Q. After your marriage on the 21st day of May, 1940, where did you then reside?

"A. I resided at my home at 2304 North Glebe Road.

"Q. Did your wife move to that home with you?

"A. Yes.

"Q. Immediately?

"A. No, sir, I think it must have been four, five or six days later."

The Jacobs home had three rooms and a bath on the first floor and three rooms, counting a hall room, but no bath, on the second floor. Jacobs said that he slept in one of the second floor bedrooms during the life of his second wife, while she slept down stairs. In his illness he sometimes slept in her room. After he married the appellant he continued to occupy the upstairs room while she took a first floor room.

In the direct examination of Jacobs he was asked no question relating to the consummation of the marriage nor did he make any specific statement relative thereto. On cross-examination he gave the following testimony:

"Q. Mr. Jacobs, you state that your marriage was never consummated. Do you still want to say that, you know what I mean by that, do you not?

"A. I guess so. No, it was not.

"Q. Did not Mrs. Jacobs spend the second night with you after you were married with you in your bed?

"A. She did not. No, sir.

"Q. While your housekeeper was in the next room?

"A. No.

"Q. You mean to infer that Mrs. Jacobs never slept in your bed while she was there?

"A. She never did.

"Q. Did you ever go to her bed?

"A. I went to her bed and she came to my bed once."

He did not testify that he ever requested the appellant to consummate the marriage or that she refused to do so. He does testify, however, that she would not occupy his bedroom upstairs, that she was abusive to him, taught him to drink intoxicating liquor and kept him awake with noisy parties at night at their home, but that he never saw any conduct that caused him to believe she was unfaithful to him.

On August 22, 1940, four days after Mrs. Jacobs came to permanently reside in their joint home, the appellee, with a relative, went to the office of Mr. Crandal Mackey, a prominent attorney of Arlington, Virginia, and consulted Mr. Mackey with reference to getting a divorce and a return of the property conveyed to his wife. Mr. Mackey thereupon wrote Mrs. Jacobs a letter about the matter and she in turn had her attorney go to Mr. Mackey's office and confer with him. There were a number of telephone conversations between Mr. Mackey and Mrs. Jacobs, in which the latter described some of her difficulties and related her side of the case. What was actually said is in conflict between the two. Mr. Mackey testified that in one of the conversations relating to the complaint of Mr. Jacobs that his wife did not occupy his bed or his room, she stated that she preferred to stay downstairs where the bathroom was, and in answer to another question she replied, "Who can sleep with a corpse?" The latter statement Mrs. Jacobs denies making. No legal action was taken by Mr. Mackey on behalf of Jacobs and the former has taken no part in this proceeding except as a witness.

Jacobs, upon advice of Mr. Mackey, began early in 1941 to keep a diary, which he continued to May 13 of that year. From this diary he undertook to refresh his memory as to the difficulties he had with his wife. He and his wife

continued to live in the house until June, 1942. There was friction between them during some of the time, but during the remainder of the time they seemed to have gotten along contentedly. Mrs. Jacobs attended to the household duties and in addition pursued her nursing profession each day for eight hours a day in some hospital. She cooked most of the meals and performed the household duties without the assistance of any domestic help because of lack of funds, the appellee making only a small contribution to their domestic expenses.

On January 13, 1942, Jacobs was seriously injured by being struck by an automobile. He was taken to a hospital, where he remained until May 1, 1942. Mrs. Jacobs, in addition to her regular duties as a nurse, gave considerable attention to her husband, visiting him at the hospital and bringing him food and delicacies. When he was pronounced well enough to leave the hospital he objected to leaving. He was taken to his home, where he remained until June 11, 1942. He was in a weakened condition and confined to his bed. His wife purchased a pair of crutches for him so that he could walk around. Incontinency in his habits, his inability to restrain his natural evacuations, were very embarrassing to him, and required considerable attention from the appellant. On June 11, without informing the appellant of his intention to leave or advising her where he intended to go, Jacobs left his home in company with his niece and shortly thereafter went to the home of another relative at Lively, Virginia, where he has since resided. Mrs. Jacobs has continued to live in the home. She has not communicated with him except to undertake to forward his own personal property which he asked for by letter.

It appears from the testimony of Mrs. Jacobs, and it is admitted by the appellee, that she was very reluctant about entering into the marriage; that the offer to convey his property was initiated by him and was entirely voluntary on his part; that the reservation of the life interest of Jacobs was put in the deed at the suggestion of Mrs. Jacobs; that the date of the marriage was hastened at his request; and

that it was agreeable to him for her to live at the home of her sister until his house could be repaired and renovated for their joint use.

Mrs. Jacobs admits that the offer to convey the property to her had much to do with her consent to the marriage; that she was irritated at times by the conduct of her husband and at such times she did call him some names, though not vile, and on one or more occasions she lightly struck him in protest of his actions or words; and that she told him that at the time of her marriage to him she also had an offer of marriage from another man. She denies that her friends who came to her home caused Jacobs any trouble, but that on the other hand he joined in with them, and participated in their social drinking, frequently becoming the life of the party, and that his conduct before marriage indicated that he was accustomed to use ardent spirits in a moderate way. Her testimony in many respects is borne out by other witnesses, including her two sons and a female relative of her husband.

Mrs. Ella M. Chester, a cousin of Jacobs, had been his housekeeper for eight months prior to his marriage with Mrs. daCruz. She characterized Jacobs as "a very peculiar man, and always has been all his life". She was at their home on May 21, 1940, the day of the marriage, and she said that the newly married couple immediately came to that home. With reference to the relations between Jacobs and his wife Mrs. Chester corroborates the appellant in the following respect when questioned about the joint use of his bedroom:

"Q. That is where he had his bed?

"A. Yes, sir.

"Q. And that is where he slept?

"A. Yes.

"Q. Do you remember seeing Mrs. Jacobs go into that room one night?

"A. Yes, I saw her go in there.

"Q. And stayed there?

"A. Yes, sir."

These questions and answers appear in the testimony of Mrs. Jacobs with reference to the same night.

"Q. Did you stay in his bedroom all night, that night?

"A. Yes, I did.

"Q. In his bed?

"A. Yes, I did.

"Q. Did you try to make Mr. Jacobs a good and faithful wife?

"A. I couldn't have done better, under the circumstances.

"Q. Now, what were your intentions towards Mr. Jacobs as his wife?

"A. I was his wife in every sense of the word."

Both Jacobs and the appellant were persons of good character and reputation in their community. He was no callow youth nor she an immature maiden. Both had experienced the responsibilities of marriage. Jacobs knew that Mrs. daCruz had been divorced from her first husband on the ground of desertion. She had two grown sons, both in the armed services of this country. Each of the sons testified that their mother tried to make a good home for Jacobs, and that they seemed to get along very well together. Mrs. Jacobs made reasonable explanations of many of the complaints of her husband. She gives him a good name and says that he was likable and affectionate most of the time, but that he was a proud man and somewhat difficult to please. She does assert that Jacobs deceived her as to his financial worth and that he failed to make a proper contribution to their household expenses. She relates an instance where, in a spirit of pique, he caused her embarrassment in her financial relations with a merchant.

Mrs. Jacobs never denied her husband access to his home nor the use thereof. Jacobs knew that she had to keep herself employed because he was unable to support her properly on his retired pay. He falsely gave his age as 70 in applying for the marriage license. He testified that he had only visited Mrs. daCruz two or three times before the marriage, while the evidence of several witnesses disclosed that he visited her three or four times each week and

saw her nearly every day. Mrs. Jacobs stated that he came to see her at her sister's home approximately three or four times a week from March until May and that they met almost daily down town; that he seemed to be very fond of her and brought her gifts of flowers, candy and hosiery; that he told her he was going to have her "by hook or crook"; that she told him that he was too old to marry, and that they could not find happiness together because of the difference in their ages and tastes; and that, although she further told him that she was interested in some one else who was interested in her, he nevertheless pursued her morning, noon and night until she consented to marry him.

The evidence is conclusive that Mrs. Jacobs was the pursued party. She made no false professions of affection and devotion to lure him on. The record does not show that she exhibited any of the wiles of a woman seeking marriage solely for the purpose of acquiring the material possessions of her intended victim, unless her hesitation and reluctance were strategy deceitfully employed; and such charge is refuted by her frank representations of the situation to her suitor.

To justify an annulment of the marriage there must be some clear evidence, circumstantial or direct, that the appellant did not intend before the marriage or at the time of the marriage to become in truth and fact the wife of the appellee. There being no direct evidence to that effect, the appellee relies upon the circumstances attending the marriage, the conveyance of the property and the conduct of the appellant after the marriage and delivery of the deed.

The conduct of Mrs. Jacobs towards her husband after the marriage, however material it may be on the question of divorce, is relevant on the issue of annulment only as it may reflect a preconceived intention on her part fraudulently to bring about the marriage and the gift of the property. The evidence as to the physical consummation of the marriage is in conflict. In the nature of the situation no one knows the truth except the parties. Aside from their testimony, the more reasonable inference from the facts and cir-

cumstances is that if there was a failure of consummation such failure was due as much, if not more, to the fault of the appellee as to that of the appellant.

There is no moral or legal reason forbidding a woman to tell her suitor that she will not marry him unless he conveys to her certain of his property or makes some provision for her financial security after marriage. There are many instances where such a precaution might have prevented future financial distress and subsequent unhappiness in the marital union. In this case Jacobs had no descendants, and his union with this appellant added considerably to her responsibilities. Mrs. Jacobs would have been negligent and careless, indeed, if she had not had the common sense and prudence to obtain some provision for her future security. The fact that she urged the reservation of a life interest in the grantee indicates that she was not wholly avaricious. Of course, the gift of the property was a vital consideration for the marriage, and under the circumstances its tender and acceptance does not establish proof of a preconceived intention on her part not to perform the natural incidents of the marital relation.

Each of the parties was legally sane and competent to enter into a contract. Jacobs had a right to dispose of his property as he saw fit. Mrs. Jacobs had the right to protect her personal interests and look out for her future. The marriage and the conveyance of the property may have been instances of bad judgment. Apparently what Jacobs needed most was a good nurse. He undertook to secure for himself a nurse and a wife in one person. He more readily imagined his potentialities than he realized his limitations. He sought and found a healthy woman forty-two years old. In his ardent desire to make her his wife he voluntarily offered to give her his property. He fulfilled his promise, but when he discovered that his expectations were not or could not be realized he became dissatisfied. Realizing his mistake, he would now cancel and annul his obligations and contract, resume his unmarried status, recover his property and abandon the object of his former pursuit.

There was little common ground for the enjoyment of the marital union of the parties. This seems to have been perceived by Mrs. Jacobs. She brought it to the attention of the appellee, but he, nevertheless, in the excess of his emotions, disregarded the warning. Courts do not exist to guarantee happy and successful marriages, or to annul and cancel the effect of mere errors of judgment in the making of contracts of marriage. In the absence of fraud, duress or other improper elements affecting such transactions no relief can be granted.

It is true that the report of a commissioner in chancery is entitled to respect and to a greater weight where the evidence has been taken in his presence. However, it is the duty of the court to review and weigh the evidence, and if in its opinion such report is unsupported by the evidence, to reject it. Virginia Code 1942 (Michie), sec. 6179; *Shipman* v. *Fletcher*, 91 Va. 473, 22 S. E. 458; *Clevinger* v. *County School Board*, 139 Va. 444, 124 S. E. 440; *Eppes* v. *Eppes*, 181 Va. 970, 27 S. E. (2d) 164.

As stated by Judge Prentis, afterwards Chief Justice, in *Clevinger* v. *County School Board, supra*, at page 447: "It is fundamental, however, that notwithstanding the weight due to a commissioner's report and the respect which is accorded his findings, neither the trial court nor this court should avoid the duty of weighing the evidence when its sufficiency is fairly challenged. Neither in the trial court, nor here upon appeal, should any judgment stand if the record shows that it is unsupported by the testimony".

The testimony of Jacobs, upon which his contentions are principally based, was taken out of the presence of the commissioner. That testimony was contradicted by the direct positive evidence of the appellant, and her evidence was supported by other witnesses whose credibility was unimpeached. Under the circumstances we are as well equipped to weigh Jacobs' evidence as was the commissioner. As a matter of fact, the meager testimony of the appellee as to the consummation of the marriage and his hazy, cloudy and conflicting statements and admissions on other matters con-

nected with his courtship and marriage are far more subject to the charge of unreliability than the evidence on behalf of his wife. The circumstances surrounding the promise of his gift of the property, the execution and delivery of the deed more than a month after the marriage, when he had been afforded ample opportunity to test her intention to consummate the marriage, and his delay in instituting this proceeding for more than two years, all concur to refute his contention of fraud on the part of his wife. There is nothing to support an arbitrary conclusion that Mrs. Jacobs is unworthy of belief.

Appellee relies strongly upon the case of *Pretlow* v. *Pretlow, supra.* In that case it was held there was ample evidence to support the finding that Mrs. Pretlow never intended that the marriage should be consummated. That essential element of proof is lacking here. Clear and satisfactory proof of a preconceived intention to deceive or defraud is not established in this case.

For the foregoing reasons the decree of the trial court is reversed and this cause remanded for such further proceedings as the pleadings may entitle the parties to, or which the court may deem proper thereunder.

*Reversed and remanded.*