# Richmond

## A. F. Clark, Executor, etc. v. William A. Atkins and Pearl B. Atkins.

January 10, 1949.

Record No. 3412.

Present, Hudgins, C. J., and Gregory, Eggleston, Buchanan, Staples and Miller, JJ.

*T. L. Hutton, Fred C. Parks* and *George B. Kreger,* for the appellants.

*Fred B. Greear* and *Thomas C. Phillips,* for the appellees.

GREGORY, J., delivered the opinion of the court.

William A. Atkins and his mother, Pearl B. Atkins, instituted this suit in chancery against A. F. Clark, executor, and the heirs of Arthur L. Clark, deceased, for the purpose of obtaining the real and personal property of which Arthur L. Clark died seized and possessed, by reason of a certan oral contract which was alleged to have been made by Arthur L. Clark, with William A. Atkins. The trial court upheld the validity of the oral contract and directed the delivery to William A. Atkins of certain of the estate of Arthur L. Clark, deceased. The residue of said estate was directed to be delivered to the heirs at law of the said Arthur L. Clark. It is from this decree the appellants appeal. Nothing was given Pearl B. Atkins by the decree and she has assigned no cross-error. She is now effectively out of the case.

The evidence was taken by depositions, and the trial court filed a written opinion which was carried into effect by the decree.

The oral contract by which William A. Atkins claimed the estate of Arthur L. Clark, deceased, was that Clark made the following offer to Atkins which was accepted by him: "Bill (meaning William A. Atkins), if you come down here and learn this business and do right I will leave you this business and all I have got." In pursuance of that offer it was alleged that Atkins immediately started to work in the meat market and store owned and theretofore operated by Clark. Atkins continued his services there and was operating the business at the death of Clark on December 9, 1945.

Clark had been a lifelong resident of Abingdon, Virginia, and a merchant there for many years, and had never

married. After he died his real estate was appraised at $29,500, and that, together with his personal property, made an aggregate appraisal for his entire estate of $48,624. A substantial portion of his personal estate was invested in the meat market and store. At the time of his death he was about 62 years of age, and was not survived by any brothers and by only one sister.

After the death of Clark a will was found, made in 1927, devising and bequeathing to his brother, Eldridge Clark, all of his estate. Eldridge Clark predeceased Arthur L. Clark by many years and the will was ineffectual to pass the estate though it was admitted to probate. At the time of this will, in 1927, Eldridge Clark made his own will leaving all his estate to his brother, Arthur L. Clark. Eldridge and Arthur were partners in the meat business. Those wills have no particular bearing on the case.

Pearl B. Atkins, the mother of William A. Atkins, claims that he is the son of Arthur L. Clark. Clark had constantly recognized William A. Atkins as his son from the latter's birth. Clark had met Pearl B. Atkins in 1915, when she was 15 years of age, and in 1919 she gave birth to a son who is William A. Atkins. The evidence points unerringly to the truth of the fact that William A. Atkins was the son of Arthur L. Clark,—in fact, there is no substantial evidence to the contrary.

Clark continued to go with Pearl B. Atkins until the time of his death in 1945. All through the years he had been constant in his attentions to her, and during his last illness, while in the hospital for several weeks, she attended him. William A. Atkins, while attending school, worked during the summertime around the meat market for Clark who spoke of him as his son, and Atkins spoke of Clark as "dad". In 1941, after two years in college, Atkins entered the armed services and remained until 1945, having spent some 33 months in foreign service. While in the service Clark wrote him and sent him presents, addressing him as his son. Clark had from time to time indicated a desire to leave his property to Atkins, and immediately upon his

return to Abingdon Atkins went to the meat market to work. It was at this time that Clark told Atkins that if he, the latter, would come down and learn the business and do right that Clark would leave the business "and all I have got" to him. No one heard the offer made by Clark and its acceptance by Atkins except themselves. However, there are nine witnesses, most of whom are not interested or related to the parties, who testified that Clark had stated to them on various occasions that he expected to leave the meat market business to his son. These witnesses afford sufficient corroboration of the contract to supply the essentials required by the provisions of Code, section 6209.

When Atkins began work he was paid $25 per week for his services. He worked long hours in an efficient manner. During the illness of Clark which continued for several weeks, Atkins had complete control of the business, assumed his responsibilities, such as doing the buying and selling, collecting the bills, paying bills, keeping the bank accounts, and other things that are necessary in conducting such a business in a satisfactory manner. Clark had reposed complete confidence in him. He went there in August and continued until after the death of Clark in December, and from the time of the latter's death he continued for the administrator until the latter sold the business. From August until December Clark had the daily companionship of his son, and during his last illness the son called upon him at the hospital three or four times a day.

The question presented is whether or not the contract alleged should be specifically enforced in this case.

The court established the validity of the contract and construed the words "and all I have got" to mean all that Clark had pertaining to the meat and store business. The appellee, Atkins, has not taken any exception or filed any cross-error to the construction of these words by the court, and so far as he is concerned the construction placed upon them is now binding upon him. We think the court correctly construed the contract.

The Virginia cases time and again have held that

courts of equity will not allow the statute of frauds to be used as an instrument of fraud. Contracts like the one here involved are taken out of the operation of the statute of frauds and enforced in chancery because the remedy at law is not adequate and it would amount to a fraud on the party who, in reliance on the contract, has performed it. These principles have been stated and restated many times by out court.

*Wright* v. *Pucket*, 22 Gratt. (63 Va.) 370, is one of the early cases on this subject. There the existence of the contract was in serious dispute. It had not been clearly proven and it was indefinite in its terms. The alleged contract as testified to by one of the witnesses was that Wright, the owner, said to Pucket that if he (Pucket) would come and help him on the farm he should have a part of it. On that offer, Pucket worked for Wright a part of the time for 6 or 8 years. This testimony was corroborated in part, but in behalf of Wright there was testimony that Pucket had attempted without success, to purchase from Wright the land on the east side of the creek, which Pucket claimed, while he claimed the contract was in force. Of course, if this was the land Wright was to give Pucket for his services it was an inconsistent step on the latter's part to attempt to purchase what was to be his.

The court, however, held that the contract was too indefinite and uncertain to be specifically executed, and that there was not such part performance as would take it out of the statute of frauds, but in so holding, the court laid down the principles of law which apply to this day in all cases of this kind. Those principles are:

"Courts of equity, however, in their efforts to do complete justice and prevent fraud, have in certain cases relaxed the operation of the statute; and in cases where a parol agreement for the sale of land has been clearly and distinctly proved, and part performance in pursuance of the agreement established, a court of equity will decree specific execution.

"But the principles upon which courts of equity have avoided the statute of frauds, upon the ground of part per-

formance of a parol agreement, are now as well settled as any of the acknowledged doctrines of equity jurisprudence. From the numerous decisions on the subject the following principles may be extracted and briefly stated as follows: 1st. The parol agreement relied on must be certain and definite in its terms. 2d. The acts proved in part performance must refer to, result from, or be made in pursuance of the agreement proved. 3d. The agreement must have been so far executed that a refusal of full execution would operate a fraud upon the party, and place him in a situation which does not lie in compensation. Where these three things concur, a court of equity will decree specific execution. Where they do not, it will turn the party over to seek compensation in damages in a court of law."

Again the court held that Pucket could be compensated in damages. It said: "Nor has there been in this case such part performance as cannot be compensated in damages. There was nothing in the situation of the appellee to prevent his recovering, in a suit at law, full indemnity and compensation for the services he rendered to the appellant's intestate; and that was his plain and adequate remedy. The tendency of all the modern cases, both in England and in this coutry, is to prefer giving the party compensation in damages instead of a specific performance. Wherever damages will answer the purpose of indemnity, this alternative will be preferred, as it will equally satisfy justice, and will be coincident with the provisions and in support of the authority of the statute."

There are many distinguishing features between that case and the one at bar. There the contract was never satisfactorily proven and there was no part performance of the contract on the vendee's part. He was never placed in possession of the land which he claimed, and his services could have been compensated in damages, while in the case at bar the contract was clearly proven by the testimony and witnesses afforded sufficient corroboration under section 6209 of the Code. Atkins took possession of the business and successfully operated it certainly from the

time Clark entered the hospital, thereby relieving Clark, while in failing health, from the responsibilities of the business, and affording him the comfort and satisfaction that it was being successfully conducted.

In *Cannon* v. *Cannon*, 158 Va. 12, 163 S. E. 405, the rule laid down in *Wright* v. *Pucket, supra,* was reiterated, and a parol contract for the conveyance of land was specifically executed.

In *Timberlake* v. *Pugh,* 158 Va. 397, 163 S. E. 402, which involved an action for damages for breach of an oral contract to transfer the title to land, the court sustained a verdict and judgment for the fair value of the property which had been promised to be conveyed, thereby applying the same principle.

In *Adams* v. *Snodgrass,* 175 Va. 1, 7 S. E. (2d) 147, one of the latest cases, Mr. Justice Holt, applying the same principle, quoted with approval from *Svanburg* v. *Fosseen,* 75 Minn. 350, 78 N. W. 4, 74 Am. St. Rep. 490, 43 L. R. A. 427, this statement of the law: "* * * where, in a parol agreement for the purchase of real estate the consideration consists of services to be rendered which are of such a peculiar character that it is impossible to estimate the value to the vendor by a pecuniary standard, and neither party intended so to measure them, the performance of the services will entitle the vendee to a specific performance, notwithstanding the contract was by parol."

For a list of the cases touching this subject see Digest of Va. and W. Va. Reports (Michie), Vol. 5, pp. 79 to 82, inclusive and Perm. Supp., Vol. 3, pp. 380-381.

The appellants invoke Code, sec. 5141 (Michie). This statute provides, among other things, that "No estate of inheritance * * * in lands shall be conveyed unless by deed or will * * * nor shall any right to a conveyance of any such estate or term in land accrue to the donee of the land * * * under a gift or promise of gift of the same hereafter made and not in writing although such gift or promise be followed by possession thereunder and improvement of the land by the donee * * *."

We do not think that the section quoted has any application to the case at bar. Prior to the adoption of section 2413 of the Code of 1887, now section 5141 of Michie's Code of 1942, an oral promise to give or devise land, followed by possession and improvements, was sufficient to support a right to a conveyance from the heirs or devisees of the donor, but since the adoption of this section such a promise must be in writing in order to be enforced. See *Mann* v. *Mann*, 159 Va. 240, 165 S. E. 522, and *Creed* v. *Goodson*, 153 Va. 98, 149 S. E. 509. In the case at bar there was not a parol gift of land. Atkins relied upon and proved an oral contract for the purchase of the meat business and what pertained to it in exchange for his services in conducting and operating said business for the lifetime of Clark. This consideration on his part has been fully performed.

It is urged that the services of Atkins were not of a peculiar or personal nature; that they could have been compensated in damages at law, and that under such circumstances he was not entitled in equity to the specific execution of the agreement. The trial court, in its opinion, had this to say: "Whatever may have been his reason therefor, the evidence convinces me that Arthur Clark had a real and worthy interest in the welfare and future of Wm. A. Atkins, wanted to do something worthwhile for him and intended that Atkins should have a substantial part of Clark's considerable estate. The *meritorious* outweigh the *valuable* considerations as it seems to me. Both, taken together, are amply sufficient to support the contract, if there was one. Clark, in words and conduct seems to have recognized a high moral obligation to Atkins which equity will in a proper case treat as meritorious consideration. Pomeroy's Eq. Jur., 5th Ed., Sec. 588; *Adams* v. *Snodgrass*, 175 Va. 1, 7, 7 S. E. (2d) 147."

The contract and the performance of it by Atkins was not indefinite or uncertain, it was clearly proven. The father, from the continued interest he manifested in his son until the father's death shows that the father had affec-

tion for and pride in his son. The son had surmounted and overcome a tremendous obstacle in life. It is unusual to find one so situated who possesses the courage and fortitude to ascend rather than descend life's ladder. His achievement and success in so short a time have been great. It can be inferred from the fatherly interest that the father anticipated and hoped for the close companionship of his son in the business. He had assisted his son in going to college and he desired to see him become a successful man. Under the plan the father's ambition for the son was being satisfied, while in turn, a profitable business eventually going to the son created an incentive in the son for success. These are some of the considerations that form the background for the transaction. In addition, the transaction is supported by the highest moral consideration. The son has shown himself to be worthy, and an honest and efficient business man. His part of the bargin he has performed in a satisfactory manner. When all of these things are considered in the light of all the surrounding circumstances we cannot say that the son's services now can be paid for in dollars. To turn over to the son the meat business and all that pertains thereto meets with the wishes of the father and the demands of justice.

The court, by its decree, segregated and set apart to Atkins the real estate used in connection with the meat and store business, and also the money in bank, livestock and tobacco, equipment, inventory, accounts, and "E" bonds that were a part of the estate. According to the appraisal the aggregate value placed upon this portion of the estate is $29,326.43. The court also set aside certain other property formerly belonging to Clark, to his heirs. This property consisted of real estate and furniture of the appraised value of $17,500. There is no assignment of error or of cross-error challenging specifically the correctness of the division made by the court. We, therefore, do not question it upon this appeal. (Code, sec. 6346.)

One thousand dollars was set aside by the court for Mrs. Stamper and Virdie Bingham, who were to have $500 each. We think this $1,000 should be restored to the assets of the

estate and that Mrs. Stamper and Virdie Bingham should proceed to establish properly their respective claims before the administrator. With this modification, we think the decree should be affirmed.

*Modified and affirmed.*