## Richmond

ELLA TAYLOR v. CONSTANCE TYLER HOPKINS.

November 22, 1954.

Record No. 4265.

Present, Eggleston, Spratley, Buchanan, Miller, Smith and Whittle, JJ.

The opinion states the case.

*James H. Raby*, for the appellant.

*Charles G. Stone,* for the appellee.

MILLER, J., delivered the opinion of the court.

C. S. Fitzhugh, a resident of Sparrows Point, Maryland, died intestate on December 27, 1950, possessed of about nineteen acres of land in Fauquier county, Virginia, on which was an uncompleted seven-room residence. Decedent, who had never married, was sixty-five years old when he died. He left as his heirs a sister, Ella Taylor, two nieces, Elizabeth Tyler and Estelle Coleman, and two grand-nephews, Burnell Irby and Herbert Corbin.

On July 7, 1951, Ella Taylor instituted suit against the other four interested parties and sought partition of the real estate. Before adjudication upon any rights or interests of the parties in the subject matter, Constance Tyler Hopkins, a daughter of Elizabeth Tyler, and hereinafter called petitioner, appeared and asserted ownership to "the full, equitable title" in the real estate, asked to be made a party to the cause, and prayed that she be permitted to prove her ownership of the property. No objection was made to this procedure and petitioner was admitted as a party defendant and authorized to file an answer or crossbill in the cause. In her answer and cross-bill she asserted that decedent visited her at her home in Washington, D. C., during the summer of 1946 and made her the following verbal offer: "That if cross-complainant would go ahead and build a house on said property and reserve a couple of rooms for him which he could use at any time, and would therein provide him with a home after he decided to retire from his work, that he would make a will in her favor for the entire property."

It is then alleged that she accepted decedent's offer, undertook to build a residence upon the tract of land, expended the sum of $8,000, exclusive of her own and her husband's labor, in erection of the building, and that it was sufficiently completed in June of 1950 for them to move into the premises and that they have lived there ever since. It is

further alleged that decedent visited her in Fauquier county from September 20 to October 6, 1950, told her that he had executed his "will in her favor for said property," and that he was then making plans to retire from work and come to live with her but died before doing so.

Ella Taylor and Burnell Irby filed answers to this cross-bill and denied that a contract had been entered into by decedent with petitioner or that she had expended the sum claimed in erecting the residence, and took issue on all other material allegations of the cross-bill. They also asserted that petitioner had been in possession of and used the premises since 1947 and that she should be required to pay reasonable rent.

The cause was referred to a Commissioner, and in addition to the usual inquiries required to be made in a partition suit, the Commissioner was directed to ascertain and report, "Whether or not Constance Tyler Hopkins is entitled to any of the real estate, and if so, how much."

The testimony was taken in deposition form, but not in the presence of the Commissioner. He reported that petitioner had proved execution of the oral contract, that in pursuance thereof she had entered into possession of the real estate and expended funds in erection of the residence, and that she was the equitable owner of the property.

Exceptions to this report were taken by Ella Taylor, which are to the effect that the evidence was insufficient to establish that the alleged contract was made by decedent with petitioner, or, if made, that it had been performed by the latter. These exceptions were overruled and the report confirmed. The court held that petitioner had "established herself to be the equitable sole owner of all of the real estate, with improvements thereon * * *," of which decedent died seized, and a special commissioner was appointed to make conveyance thereof to Constance Tyler Hopkins. From that decree Ella Taylor sought and obtained an appeal.

Ella Taylor invokes subsection 6 of section 11-2, Code of

1950[1], commonly called the statute of frauds, which forbids the bringing of an action upon a contract for the sale of real estate unless there be some written memorandum or note thereof signed by the party to be charged, or his agent. She also relies upon § 8-286, Code of 1950[2], which precludes entry of a judgment or decree in favor of a party to a contract upon his uncorroborated testimony if the other party to the contract be incapable of testifying.

■ The controlling question is whether or not the evidence establishes that the contract alleged in the cross-bill was made, and that petitioner, in pursuance thereof, took possession of the property and performed her part of the agreement so that it would be a fraud upon her, not compensable in damages, to deny her full execution of the agreement.

If the parol contract and the performance by petitioner of her part of the agreement be established by the evidence, then in equity she is entitled to its full execution and conveyance of the real estate notwithstanding the provisions of the statute of frauds. *Bowman* v. *Wolford*, 80 Va. 213; *Henley* v. *Cottrell Real Estate, etc., Co.*, 101 Va. 70, 43 S. E. 191; *Cannon* v. *Cannon*, 158 Va. 12, 163 S. E. 405; *Clark* v. *Atkins*, 188 Va. 668, 51 S. E. (2d) 222; *Wright* v. *Dudley*, 189 Va. 448, 53 S. E. (2d) 29; 8 M. J., Frauds,

---

[1] "No action shall be brought in any of the following cases:

\* \* \* \* \* \* \*

"(6) Upon any contract for the sale of real estate, or for the lease thereof for more than a year; \* \* \*

"Unless the promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, be in writing and signed by the party to be charged thereby, or his agent, but the consideration need not be set forth or expressed in the writing, and it may be proved (where a consideration is necessary) by other evidence.

[2] "In an action or suit by or against a person who, from any cause, is incapable of testifying, or by or against the committee, trustee, executor, administrator, heir, or other representative of the person so incapable of testifying, no judgment or decree shall be rendered in favor of an adverse or interested party founded on his uncorroborated testimony; and in any such action or suit, if such adverse party testifies, all entries, memoranda, and declarations by the party so incapable of testifying made while he was capable, relevant to the matter in issue, may be received as evidence."

Statute of, § 34, p. 798. But the parol contract sought to be enforced must be certain and definite in its terms, and the evidence relied upon to establish the contract and its part performance by the party seeking to enforce it must be clear and convincing.

"(1) The parol agreement relied on must be certain and definite in its terms.

"(2) The acts proved in part performance must refer to, result from, or be made in pursuance of the agreement proved.

"(3) The agreement must have been so far executed that a refusal of full execution would operate a fraud upon the party and place him in a situation which does not lie in compensation." *Wright* v. *Pucket*, 22 Gratt. (63 Va.) 370, 374.

"To sustain a bill for specific performance of an oral contract of purchase, the evidence must be clear, full, and free from suspicion. * * * It must also disclose the price to be paid; this being an essential element of the contract." *Pickens* v. *Stout*, 67 W. Va. 422, 429, 68 S. E. 354, 358. *Hale* v. *Hale*, 90 Va. 728, 19 S. E. 739; *Boyd* v. *Cleghorn*, 94 Va. 780, 27 S. E. 574; *Plunkett* v. *Bryant*, 101 Va. 814, 45 S. E. 742; *Mann* v. *Mann*, 159 Va. 240, 165 S. E. 522; *Pair* v. *Rook*, 195 Va. 196, 77 S. E. (2d) 395.

Appellant's contention challenges and tests the sufficiency of the evidence to sustain the report and justify the decree confirming it. The testimony, as will be seen, is conflicting and inconsistent in some particulars, and it was not taken in the presence of the commissioner. Thus his report and the decree sustaining it, though presumptively correct, are not entitled to the same weight as they would be entitled to had the report been based upon evidence taken in his presence. *Lavenstein* v. *Plummer*, 179 Va. 469, 19 S. E. (2d) 696; *Jacobs* v. *Jacobs*, 184 Va. 281, 35 S. E. (2d) 119; *Ashby* v. *Dumouchelle*, 185 Va. 724, 40 S. E. (2d) 493; *Klingstein* v. *Eagle*, 193 Va. 350, 68 S. E. (2d) 547.

We now consider the evidence with these principles in mind.

Constance Tyler Hopkins testified that for years prior to June, 1950, she and her husband had rented an apartment in Washington, D. C., where both were employed in salaried positions and that during July, 1946, she had a conversation by telephone with decedent who was then living and employed in Sparrows Point, Maryland. In that conversation she says that she informed him of a plan on her part to purchase the property of one Catherine Young in Fauquier county and move there to live, but he insisted that she not purchase that property and said "that he was willing me his estate if I would build a house and reserve him two rooms, and care for him when he retired in about four years, and he would assist me financially." She then said that she discussed decedent's offer with her husband and that within a week decedent visited them in Washington, there renewed his offer, which she accepted, and she and her husband began to clear the bushes and briars from the land. She also testified that in the spring of 1947 they put out fruit trees and some shrubbery, and in 1948, began the erection of a seven-room, two-story residence and that about eight thousand dollars was expended on the property and house, in addition to their labor, which consisted of excavation, cement and carpentry work of considerable value. The house was sufficiently completed to be occupied in June, 1950, and on the 15th of that month petitioner and her husband moved from Washington and took up their residence in the new home. She also said that she had paid all taxes on the place since 1946, that several times subsequent to 1946 decedent told her that he had executed his will in her favor, that he visited them at the new residence from September 20 to October 6, 1950, and that she stood ready to receive him in the home had he retired and come there to live. However, after alleging in her cross-bill that she expended over $8,000 in cash on the improvements, before concluding her deposition, she expressly said that decedent paid about $3,200 of the cost of construction and that she and her husband furnished the difference between the $3,200 and the $8,000. On cross-examination she admitted that from time to time she mailed bills incurred for the construction of the property

to decedent, and he would send her the money needed to defray those expenses, and that when the taxes were paid, the receipts were always mailed to decedent. Though she testified that she and her husband maintained a joint bank account, yet no cancelled checks or like evidence of expenditures by them were tendered in evidence, nor did petitioner's husband testify in the cause.

Three other witnesses, *i.e.*, Sarah McKenzie, Daniel Dishman, and Pedro D'Clark, were called by petitioner. The testimony of Sarah McKenzie was that on two occasions decedent talked with her about his affairs, *i.e.*, in Washington, D. C., in 1946, and in Fauquier about September 20, 1950. In the first conversation decedent indicated that he and petitioner were going to build a house "and have a home together, because he never expected to get married." On the second occasion decedent said that he had made a will and "left everyone of his family sufficiently not to interfere with the other," and he had left Constance Hopkins "the old home place," the land in question. She also said that on the occasion when he visited in Fauquier he asked her if she would place his will and some papers in the People's National Bank of Warrenton and serve as executor of his estate, both of which she declined to do.

Daniel Dishman testified that he worked on the residence as a plumber's helper, and that in the fall of 1950 when his employer asked decedent about the location of a pipe in the building, decedent replied, "It is all right with me. See Connie. It belongs to her." When a similar question was asked him at another time, decedent replied, "You will have to ask Connie. It is all hers."

Pedro D'Clark, who had known decedent intimately for twelve years and been his roommate during that time except for the last few weeks of decedent's life, testified that during 1946, 1947, or 1948, he had a conversation with decedent concerning his property in Virginia, and decedent's statement to him and the colloquy were as follows:

"A. * * * 'I have give Connie this, and all of it already,' and I asked him the second time. 'Did you put it in writ-

ing?' He said 'No, it is time enough for that.' I said 'It is always best to put those things in writing.'

"Q. Are you positive he said she was going to build a house on the land, and he was going to help her build it?

"A. He said Constance wanted to build, and he was going to help her build, because he wanted a residence, so he could go there when he could not work. He said that was his niece. He said that Connie was going to take care of him after he retired, and all he wanted was two rooms in the building."

The testimony of Ella Taylor and Burnell Irby was to the effect that decedent died about 2 o'clock a. m. on December 27, that Burnell Irby was with him a few hours before his death, and upon learning of his death returned to decedent's room about 5 o'clock a. m.; that Ella Taylor came to decedent's room about 2 p. m. of that day and that they took charge of his personal effects but found no will among his papers. Burnell Irby also said that he had heard Constance Tyler Hopkins say on several occasions prior to decedent's death that "she was supposed to have the place" but he never heard her assert that decedent was going to give it to her.

Ella Taylor was questioned and answered as follows relative to what she knew about petitioner's claim to the property:

"Q. Did Mrs. Hopkins ever tell you at any time that there had been any arrangement by which she would get that property?

"A. No.

"Q. When did you first learn, according to her statement, that she was claiming the property as her own?

"A. She told me he told her she could build there. I asked her did he deed it to her, and she said he said he would see that she was secured."

Gertrude Brown, sixty years of age, called as a witness by Ella Taylor, testified that she had known decedent all her life, that he had visited her regularly for the last twenty-one years, that they planned to be married and live in the house that he was building in Fauquier county when he re-

·tired from work in the spring of 1951, and that she knew that decedent gave petitioner large sums of money to be used in the construction of the house. On cross-examination she stated that petitioner told her in 1946 that decedent "had suggested to her to build on his place and that he would give her security," and she knew that petitioner started clearing up the property in ·1947. But when asked if decedent had ever told her about having written a will, she replied, "He said, 'They are after me to write a will. Why write a will? I might want to change it.'"

The only testimony bearing upon the value of the nineteen acres and improvements was given by J. L. Batchellor, a real estate agent of Alexandria, Virginia, who, at the instance of counsel for Ella Taylor, inspected and appraised the property in December, 1952. In his report he stated: "In my opinion the 19 acres are worth $3,000.00, and the house is worth $4,500.00, or a total of $7,500.00." There is no evidence disclosing that this property deteriorated in value between the summer of 1950 and the time when the appraisal was made.

Though Pedro D'Clark roomed with decedent for twelve years, neither he nor any other witness said that any of them ever saw any will of decedent's and none was found after his death. The only writing indicating that any will was ever executed by him was a letter which Sarah McKenzie testified she received in the mail from some unknown party, which, though it bore decedent's name, concededly was not written or signed by him, and thus was not admissible in evidence.

The valuation of $4,500 placed upon the improvements on the land by the appraiser definitely tends to refute petitioner's allegation in her cross-bill that about $8,000 was expended in improvements exclusive of much labor upon the building, and it tends to contradict her testimony that she and her husband furnished the difference between the $3,200 expended by decedent and the $8,000 claimed as costs for improvements.

Though petitioner's testimony is corroborated in some respects by the testimony of other witnesses and by certain

facts and circumstances, yet there is no corroboration of what the terms of the contract really were. In fact, her own testimony concerning what she and decedent expended upon improvements is at variance with the allegations of her cross-bill as to the $8,000 expenditure. This contradiction by petitioner of a material allegation of her cross-bill, her own inconsistent statements, the uncontradicted testimony of the real estate agent concerning the value of the improvements, the failure of petitioner's husband to testify, and the total lack of any documentary evidence actually establishing the expenditure of any of her own funds, cast grave doubt upon her claim as asserted in her cross-bill. Nor does any other evidence clearly show just what contract, if any, was entered into by her with decedent. In short, the evidence fails to prove that a contract, clear and definite in its terms was entered into with decedent, and it also fails to establish what petitioner expended and how she performed her agreement if a contract did, in fact, exist between her and decedent.

Petitioner relies upon *Clark* v. *Atkins, supra,* and reminds us that in that case no one heard the offer which Atkins alleged had been made by Clark, nor Atkins' acceptance of that offer, except the two parties to the contract, yet it was specifically enforced at the instance of Atkins after the death of Clark. However, in that case not only did Atkins, the offeree, fully perform his part of the alleged contract but several disinterested witnesses testified to statements on the part of Clark which definitely tended to corroborate and sustain Atkins' contention that the contract, as alleged by him, had been made. There also, the testimony of Atkins was not inconsistent or at variance with the allegations in his bill as is the testimony of petitioner.

For the reasons stated the decree appealed from will be reversed, petitioner's cross-bill dismissed, and the cause remanded to the trial court for such further proceedings therein as may be proper.

*Reversed and remanded.*