# Richmond

WILLIAM CLIFTON CLAY AND JACK CLAY v. GEORGE WASH-
INGTON CLAY.

April 25, 1955.

Record No. 4357.

Present, All the Justices.

The opinion states the case.

*Tom Irvin Gill*, for the appellants.

*W. Carrington Thompson*, for the appellee.

BUCHANAN, J., delivered the opinion of the court.

This is a suit in equity brought by the appellee, G. W. Clay, to enforce an alleged oral promise by his late wife, Dollie Lee Clay, to devise to him certain land which he had conveyed to her in fee simple. The defendants in the suit were the appellants, W. C. Clay and Jack Clay, sons of Dollie Lee Clay by a former marriage, to whom the land descended on their mother's death.

The evidence was by depositions and the trial court entered a decree deciding that there was such a promise; that appellee was entitled to have it enforced; and appointing a commissioner to convey the land to him. On this appeal the appellants contend that the evidence was insufficient to establish the alleged contract; that its enforcement was prohibited by the statute of frauds and in violation of the parol evidence rule.

G. W. Clay and Dollie Lee Clay were married in 1937. She was then the widow of J. H. Clay, a deceased brother of appellee, and he was a widower with five children by a previous marriage. At that time he owned between 300 and 400 acres of land and they moved into a house he was then repairing on the Hunt land, one of the tracts here involved —the other being known as the Thompson land across the road from it, both together forming one farm.

They seem to have lived happily together and the evi-

dence indicates that she contributed substantially to both his health and his wealth. She had about $1,300 when they were married and he testified that she lent him money to finish paying for the Hunt place. She earned several hundred dollars a year from the farm, which apparently went into its upkeep and improvement as she had no other property when she died. He was on cordial and friendly terms with her family, particularly with her son, W. C. Clay, one of appellants, and with the latter's daughter and her husband, Mr. and Mrs. Stanley Houghton, who visited him frequently. Less than a year before this suit was brought he put $8,500 into the hands of W. C. Clay with instruction to buy a farm to be conveyed to G. W. Clay for his life and at his death to W. C. Clay. The latter could not find a suitable place and the money was returned to the appellee. About the first of January, 1952, the appellee and his wife, being then too old to manage the farm, moved into the home of the Houghtons, in Danville, and lived there until the death of Mrs. Clay in June, 1952, at the age of seventy-seven. The appellee continued to make his home there after his wife's death until a short while before this suit was brought, when he went to live with some of his own children, who up to that time had shown little interest in him. The appellee was eighty-one years old when he brought this suit.

By deed dated April 8, 1949, acknowledged April 14, 1949, and recorded July 26, 1949, Dollie Lee Clay conveyed to the appellee a tract of 97 acres known as the Burrus land, which had been conveyed to her ten years previously.

By deed of the same date, April 8, 1949, acknowledged October 17, 1949, and recorded on that day, appellee conveyed to Dollie Lee Clay the two tracts of land which are the subject of this controversy. The Hunt tract contained 138 acres and the Thompson tract 71 acres. The Hunt land had been the homeplace of Dollie Lee Clay and her first husband, who had conveyed it to the appellee in 1922.

This deed from the appellee to his wife stated that it

was for a consideration of ten dollars and other valuable consideration, "the receipt in full whereof is hereby acknowledged." It conveyed the property to her in fee simple, with covenants of general warranty, of quiet possession free from all encumbrances, and of further assurances. He now claims after his wife's death that the inducing cause of the conveyance was her oral promise to make a will devising this property back to him at her death.

He testified: "I deeded it to her after she had promised me that if I was the longest liver she would will me everything." He said he had told her he was going to give her the Hunt farm in place of the Burrus land, which he thought was a fair deal, "but she wanted the Thompson tract too so I finally gave in." "I told her one day that if that is what she wanted I would deed it to her if she would deed me the Burrus land in place of it. She said, 'If you will deed me the whole thing and you should be the longest liver, I will will you everything.'" He said this agreement was made privately at their home and never discussed with anybody else, and nobody knew about it until after her death.

The two deeds of April 8, 1949, were prepared by E. C. Hurt, Jr., an attorney at Chatham. The appellee testified that it was late when they were finished so he told Mr. Hurt they would come back later and have their wills written. Afterwards, he said, his wife spoke of having the deed to her recorded, and he told her she would have to make her will according to their agreement before he would execute the deed. They came back on October 17, 1949, at which time the deed to Mrs. Clay was acknowledged and wills were prepared. Appellee testified that he then executed his will and he thought Mrs. Clay signed hers but he did not see that done as she was called into another room. He could not read or write but understood that she gave him everything she had "if I was the longest liver." He said that W. C. Clay was made the executor of his will but not of hers.

Mr. Hurt, the attorney, testified that the will of G. W.

Clay was signed and acknowledged in his office and that he was quite sure the will of Dollie Lee Clay was also signed and acknowledged in his office. He said he witnessed the will of Mr. Clay, but did not say who the other witness was. The executed will of Mr. Clay was not produced. Mr. Hurt filed his office copy of the will prepared for Mr. Clay, giving his personal property to his wife and the proceeds from the sale of his land to his five children. He also filed a carbon copy of a will prepared for Mrs. Clay, giving all of her real and personal property to her husband. W. C. Clay was named as executor in this copy. There is no evidence as to who witnessed this will. Mr. Hurt testified that his statement that it was executed by Mrs. Clay in his office was not based on personal recollection, but on the fact that the attestation clause was dated the same day as the will.

No will of Mrs. Clay was found after her death and no witness other than Mr. Hurt testified that it was signed after it was prepared. G. W. Clay said that about a month before her death he asked "where our wills were and she told me in the bottom of the cedar chest," then in the home of the Houghtons, and he took her word for it and did not bother to look. On the other hand, Stanley Houghton testified that shortly before Mr. and Mrs. Clay moved to his home he procured at Mr. Clay's request a safe deposit box in a Danville bank, and Mr. and Mrs. Clay gave him a sum of money and their personal papers, including the will of G. W. Clay, which he put into the box at the bank where it remained until after Mrs. Clay's death, when it was carried to his home and given to Mr. Clay. There was no will of Mrs. Clay among the papers and no mention was made by either of them of any will of hers.

A daughter-in-law of the appellee testified that in March, 1952, Mrs. Clay told her that she did not think Mr. Clay would live very long but that both of them had made their wills. Another witness said that a few months before the Clays moved to Danville Mrs. Clay remarked to him in

the presence of Mr. Clay that everybody ought to have a will and that she and Mr. Clay had straightened out all their business so there would be no "hereafter" about it.

Yet neither Mr. Clay nor Mrs. Clay mentioned at any time to any member of her family that she had a will, although the fact that he had one was discussed. On several occasions in the last year or two before her death it was suggested to her that she ought to make a will and she said she intended to do so. This was in the presence of the appellee, who made no comment. He was asked after her death why if he knew she had a will did he not say anything about it in all their discussions, and he replied that he thought that was her business.

The evidence is not conclusive that Mrs. Clay executed a will. It establishes only that she had a will prepared devising her property to her husband. Had the evidence shown that it was properly executed, the presumption would be that she destroyed it with intent to revoke it, as is stated in the appellee's bill. *Ballard* v. *Cox*, 191 Va. 654, 660, 62 S. E. (2d) 1, 3. In that event it would be material only if it corroborated the testimony of the appellee that she promised to make it in consideration of his deed to her, which is the promise he now alleges and seeks to enforce. That promise cannot be established after her death by his uncorroborated testimony. Code § 8-286.

"* * The character and sufficiency of the corroboration should be gauged and appraised by the fact sought to be proved. Just what is necessary to be corroborated * * must not be overlooked. * *." *Crump* v. *Gilliam*, 190 Va. 935, 941, 59 S. E. (2d) 72, 75. Whether corroboration exists and the degree and quality required are to be determined by the facts and circumstances of the particular case. Where a confidential relationship existed between the parties at the time of the transaction relied on, a higher degree of corroboration is required than in ordinary transactions. *Nicholson* v. *Shockey*, 192 Va. 270, 283, 64 S. E. (2d) 813, 821.

This alleged transaction was between a husband and

wife who lived happily together in mutual trust and confidence. After her death he seeks to set up an oral agreement with her which he says was a secret arrangement, made some three years before she died and never mentioned by either to anybody during Her life. To enforce it would in effect set aside an existing fee simple deed and set up a non-existent will. In such circumstances evidence that she had a will prepared which may or may not have been executed is not sufficient corroboration of such a contract as the appellee seeks to establish, and which is not otherwise corroborated. Such a devise, if made, could spring from usual and natural impulses as readily as from a secret contract between the husband and wife.

The necessity for corroboration here is emphasized by the circumstances of the transaction. Mr. Clay was familiar with the fact that such an arrangement as he now contends was made could easily have been provided for in the deed to his wife. Yet he made no mention of it to the attorney who prepared the deed and who asked him if he knew the effect of it. This was Mrs. Clay's home and she wanted her children to have it. Yet by the alleged contract she would have made it at least possible that it would not go to them. In doing so she would have relinquished the certainty of having the Hunt tract for them as Mr. Clay was ready to convey that to her without restriction in exchange for the Burrus land. W. C. Clay testified that the appellee told him before Mrs. Clay's death that he asked her to change the deed so as to give him some part of the property but she refused. The appellee admitted having the conversation but said he asked his wife to go with him to the attorney's office and say what she wanted her children to have so the deed could be changed to that effect. He also admitted that after her death he asked W. C. Clay what he would take to deed the property back to him, and further that he thought his wife told W. C. Clay that "she didn't want him to sell it as long as I lived."

Careful consideration of all the evidence leads us firmly to

the conclusion that it is insufficient to establish the existence of the promise alleged by the appellee. ·

██ Moreover, if the oral promise had been sufficiently proved the appellee's suit must fail because the promise would be unenforceable under the statute of frauds, Code § 11-2, which applies to an oral promise to devise real estate. *Hale* v. *Hale*, 90 Va. 728, 19 S. E. 739. In that case two sisters agreed to make mutual wills so that the survivor would get the whole estate of the one who died first, and wills were accordingly made, one of which was revoked by marriage. In a suit by the survivor it was alleged that one will was the consideration for the other and the equitable doctrine of part performance was invoked to compel compliance with the agreement. Relief was refused on the ground that to take a case out of the statute of frauds the part perform-ance relied·on must be of such an unequivocal nature as of itself to be evidence of the existence of an agreement, and such as could be done with no other view or design than to perform it. There must be no equivocation or uncertainty in the case. "The making and preserving the wills, under the circumstances stated in the bill, while they are acts con-sistent with, are yet not demonstrative of, the existence of any contract between the parties, or, in other words, they do not unequivocally show that there was a contract." 90 Va. at 734, 19 S. E. at 741. See also *Plunkett* v. *Bryant*, 101 Va. 814, 818-9, 45 S. E. 742, 744.

The recent case of *Pair* v. *Rook*, 195 Va. 196, 77 S. E. (2d) 395, was brought to have specific performance of an alleged parol agreement between husband and wife to make wills. The wife made a will to her husband but the will made. by the husband, alleged to have been in performance· of the agreement, was revoked by his marriage. It was held that the execution of the will by the wife was not part per-formance sufficient to avoid the statute of frauds. We there said that the principles set out in *Wright* v. *Pucket*, 63 Va. (22 Gratt.) 370; *Hale* v. *Hale*, *supra*, and *Plunkett* v. *Bryant*, *supra*, have been reaffirmed time after time. After pointing

out that the plaintiff seeking specific performance of an oral contract involving real estate must rely upon his own acts of part performance and not on the repudiated acts of the defendant, it was said:

"The principal act of part performance which appellants rely on is the execution of the will of Mary Moore Rook and her death without revoking it. Her will is a mere will and nothing more. It neither alludes to any contract nor refers to any other writing. * * Her devise to him, under the circumstances, is the natural and normal act of a wife, and fully consistent with her love and affection for her husband. It is not of such an unequivocal nature of itself as to furnish evidence of the existence of any agreement had between her and her husband." 195 Va. at 209-10, 77 S. E. (2d) at 402.

*Taylor* v. *Hopkins*, 196 Va. 571, 84 S. E. (2d) 430, was also a suit for the specific performance of a contract to make a will in which the principle of part performance was relied on. It was there said that "the parol contract sought to be enforced must be certain and definite in its terms, and the evidence relied upon to establish the contract and its part performance by the party seeking to enforce it must be clear and convincing." 196 Va. at 575, 84 S. E. (2d) at 432.

The part performance relied on in this case is the deed made by the appellee to his wife. It is a straight-out conveyance which makes no reference or allusion to any collateral agreement or understanding. It is a fee simple deed and nothing more. It was the natural and normal act of a husband, fully consistent with his affection for a helpful and devoted wife, conveying to her property that had been her home and which he knew she wanted for her children who had been kinder to him than his own—to say nothing of the effect of the conveyance of other property by her to him at the same time. What is said of the act of part performance relied on in *Plunkett* v. *Bryant, supra*, is applicable here: "Such an act by a husband does not necessarily refer to or result from an agreement with the wife, and is not such an

act as the husband would not have performed, except as the result of an agreement." 101 Va. at 820, 45 S. E. at 744.

The decree appealed from is ·reversed and a final decree will be entered here dismissing the appellee's bill.

*Reversed and final decree.*