# Richmond

SARAH J. PATTON, ET. AL. v. M. HOBERT PATTON, ET AL.

March 7, 1960.

Record No. 5036.

Present, All the Justices.

The opinion states the case.

*Stuart B. Campbell* and *E. G. Shaffer*, for the appellants.

*W. P. Parsons* and *R. William Arthur*, for the appellees.

SPRATLEY, J., delivered the opinion of the court.

J. W. Patton, eighty-eight years of age, died seized and possessed of considerable real estate. Included in his holdings was a three-fifths undivided interest in a tract of land in Wythe County called the McLauren Farm, containing about 313 acres, purchased jointly by himself and Elizabeth O. Patton, his wife, in 1920. On that farm was a dwelling house which was maintained as a home by the owners during their lives. Mr. and Mrs. Patton were the parents of eight children who survive both of them. One child, Sarah J. Patton, unmarried, lived in the home of her parents until they died, and another child, C. Bascom Patton, lived there until his marriage subsequent to the death of his mother.

On October 31, 1944, Mr. and Mrs. Patton executed separate wills disposing of all their estates. The wills, identical as to date, form and structure, were also mutual and reciprocal in nature.

Mrs. Patton died in 1944, and her will was probated in the Clerk's Office of the Circuit Court of Wythe County on December 14, 1944.

J. W. Patton remarried in 1950, and was divorced from his second wife a few months after the marriage. He died July 26, 1952, and the paper writing purporting to be his last will and testament was admitted to probate in the Clerk's Office of the Circuit Court of Wythe County on August 5, 1952. On the same day an appeal from the order of probate was granted upon the application of several of his heirs at law. The appeal was docketed for hearing in the Circuit Court of Wythe County, and the issue thereby raised was, by consent of all parties, submitted to be heard and determined in this proceeding.

The paper writing purporting to be the last will of J. W. Patton, after providing in the first paragraph for the payment of all his debts and funeral expenses, contained the following further provisions:

"2nd. I give to my wife, Elizabeth O. Patton and my daughter Sarah J. Patton, my undivided interest in all of my real estate for the remainder of the life of my wife, and if my wife dies within five years of my death, then my daughter Sarah J. Patton, shall

hold the same and enjoy all of the rents and profits from the same for a full period of five years from my death.

"3rd. After the termination of the interest above given, I then give unto my daughter, Sarah J. Patton, and my son, C. Bascom Patton, my undivided interest in my home and all of my bottom lands and the field north of my house, which is known as the McLauren Farm, and described as follows:

"Beginning at Gallimore's corner and running with his line north to the fence which encloses what is known as the Curfield fence, and with it to the corner of M. H. Patton's land and P. C. Shannanhan's land; thence with Shannahan's line to Cripple Creek and down the creek with my line to Gallimore's corner on the creek; thence with Gallimore's line to the beginning; to have and to hold the same jointly in fee simple.

"I have preferred Sarah J. Patton and C. Bascom Patton because of advancements heretofore made by them to me.

"4th. I give, devise and bequeath, all of the remainder of my real estate equally and jointly, unto my other children, Bertha Dollinger, Emma L. Overstreet, George B. Patton, W. Edith Delp, M. H. Patton, and Effie M. Morrisett. The interest given to M. H. Patton is for life only, and at his death I give the same to D. B. Patton his son.

"5th. I give and bequeath unto my wife, Elizabeth O. Patton and my daughter Sarah J. Patton and my son, C. Bascom Patton, all of my personal property to be theirs equally.

"6th. I hereby appoint Sarah J. Patton and C. Bascom Patton as Executors and direct that no surety be required of them when they qualify and that no sales or settlement be required of them."

The will of Elizabeth O. Patton contained items numbered 1, 4 and 6, identically the same as those found in like numbered items of her husband's will.

In item 2, she devised to her husband and son, Bascom, all of her undivided interest in her real estate for the remainder of the life of her husband, and if her husband died within five years of her death, then to her son, Bascom, for a period of five years after her death.

In item 3, she gave, after the termination of the above estate, to Bascom and her daughter, Sarah, in fee simple, her undivided interest in her home and all of her "bottom lands and the fields north" of her house, with the identical description thereof as given in her husband's will. This item contained the statement: "I have preferred C.

Bascom Patton and Sarah J. Patton because of advancements they made to me."

In item 5, she gave to her husband and her children, Bascom and Sarah, all of her personal property.

On November 7, 1952, this proceeding was instituted by M. H. Patton, Edith P. Delp, and Bertha P. Dollinger, children of Mr. and Mrs. J. W. Patton, hereinafter referred to as appellees, against their brothers and sisters and the heirs at law or devisees of the latter, in which they alleged that their father died intestate, and prayed that a partition be made of the real estate of which their father and mother died seized and possessed, among the owners thereof, in the manner provided by law, and that the accounts of their parents be settled.

Sarah and Bascom Patton, sometimes hereinafter referred to as appellants, filed an answer and cross-bill. Their answer denied that J. W. Patton died intestate, and claimed that they were entitled to the land described in the fourth paragraphs of their parents' wills. In support of their claim, they averred that a contract had been made between Elizabeth O. and J. W. Patton and themselves, wherein it was agreed, if Sarah and Bascom would assist their parents in making payments due on the purchase price of the McLauren Farm, and stay at the family home and look after them, their parents would execute wills devising the above land to their children, Sarah and Bascom. The answer further alleged the performance of the agreement on the part of Elizabeth O. Patton, the performance of the agreement on the part of Sarah and Bascom, and the attempted performance by J. W. Patton.

In their cross-bill, Sarah and Bascom averred that they were entitled to equitable relief for money advanced and services rendered pursuant to their agreement, and that if the devise in the will of J. W. Patton to them should fail, a lien be established on the real estate of their father for such advancements and services. They also alleged that the will of J. W. Patton was a reciprocal will to that executed by his wife, and that both wills were executed pursuant to an agreement between Patton and his wife and Sarah and Bascom Patton; that upon the death of Elizabeth O. Patton, her will was probated at the instance of her husband; and that he availed himself of the benefits provided for him in the said will, and that his acceptance of the benefits accruing to him thereunder, pursuant to the contract, created a fixed obligation by which J. W. Patton was legally bound to execute his part of the agreement.

Appellees filed pleas of the statute of frauds, (§ 11-2, Code of

Virginia) and the statute of limitations to the claims alleged by appellants.

In their answer to the cross-bill of appellants, appellees denied that Mr. and Mrs. J. W. Patton entered into any agreement to devise the front or bottom land of the McLauren Farm to appellants, and that Bascom had made any payments on the indebtedness of his father. They further averred that the second marriage of J. W. Patton, after the death of his first wife, had revoked his will, and that he, therefore, died intestate. The answer admitted that Sarah Patton may have furnished some money to her father to make payments on the indebtedness due on the McLauren Farm; but that such payments were merely loans or gifts, smaller than the benefits bestowed on her by her father.

Evidence was taken by depositions on behalf of the parties, and the cause submitted on the questions whether J. W. Patton died intestate, and, if he did so, whether appellants were entitled to recover for advancements made and services rendered. A decree was entered July 25, 1957, wherein the chancellor held that the remarriage of Patton revoked his will, and that Patton had died intestate. Code, § 64-58.

While the decree did not refer to the right of appellants to recover for advancements and services, it is stipulated that the chancellor subsequently stated to counsel for the parties that he intended to disallow such claims.

The cause was then referred to a special commissioner for an account and report. The special commissioner executed the order of reference, and filed his report, stating that J. W. Patton had died intestate; setting out in detail the lands owned by Mr. and Mrs. J. W. Patton; stating that there were no liens against same; that there was no indebtedness due by the Pattons; that their personal estate had been administered; and that their real estate was not susceptible to partition in kind.

Appellants excepted to the commissioner's report. By decree of February 6, 1959, the exceptions were overruled, the report ratified and confirmed, and a sale directed of all the land of which Mr. and Mrs. J. W. Patton died seized and possessed for purposes of partition.

Appellants filed five assignments of error. The principal and controlling questions presented are: (1) whether or not there was proven an oral agreement wherein J. W. Patton was to devise to appellants his undivided interest in the front or bottom land of the

McLauren Farm; and, (2) whether or not appellants established such a performance of their part of the agreement as to take the enforcement of the contract out of the statute of frauds.

We find no error in the holding of the court that J. W. Patton died intestate. Section 64-58*, Virginia Code, 1950, in effect at the time of the death of J. W. Patton and the probate of his will, provides as follows:

"Every will made by a man or woman shall be revoked by his or her marriage, except a will made in exercise of a power of appointment, when the estate thereby appointed would not, in default of such appointment, pass to his or her heir, personal representative or next of kin."

Section 64-58 is an old statute which has been carried unchanged in every Code of Virginia subsequent to the Code of 1849, until 1956. Under it many wills have been revoked over the years. While it has been in existence, we have uniformly held that its provision is peremptory and makes no exception. *Phaup* v. *Wooldridge*, 14 Gratt. (55 Va.) 332; *Hale* v. *Hale*, 90 Va. 728, 19 S. E. 739; *Shackelford* v. *Shackelford*, 181 Va. 869, 873, 27 S. E. 2d 354; 20 M. J., Wills, § 49, page 199.

The merit of the remaining contentions is dependent upon the evidence.

The deed conveying the McLauren Farm to Mr. and Mrs. J. W. Patton recites a consideration of $46,572.50, of which amount $33,-389.27 was paid from proceeds realized from the sale of another farm belonging to the purchasers. The balance of the purchase price was evidenced by a note for $13,186.00, payable in equal installments in three or four years after date. Portions of the sums of $4,500.00 received from the sale of timber grown on the farm, and $2,300.00, paid for damages on account of a highway established through the farm, were applied toward the payment of the above note, so that in 1923, the balance due on the note had been reduced to $8,500.00. In that year the Pattons obtained a loan of $8,500.00 from the Federal Land Bank of Baltimore, Maryland, for which they executed a note, secured by a mortgage on the McLauren Farm. Payments were made from time to time on this last loan, and the balance was paid in 1939.

Sarah Patton, spinster, sixty-eight years old, testified that she had been employed as United States Postmistress at Speedwell, near her home, for about twelve years, beginning in 1921, and that she had

---

* This section was repealed by Acts 1956, Chapter 65.

saved the greater portion of her salary. She said that her father, after 1925, by reason of an economic depression, found it difficult to provide funds with which to pay the interest on his indebtedness or to satisfy the loan against the farm; that she gave him money, "lots of times," as a loan to keep up his monthly payments; that finally he came to her, asked if she and Bascom had enough to pay off the loan, and said that if they would let him have it for that purpose, he would "write" his will and give them the lower part of the McLauren Farm. She said: "We figured it up and agreed; it took the biggest part of what I had left. * * * Me and him and my mother and Bass all agreed together that he would make the will and give me that to the line fence next to the Kirk field. They made the agreement, all four of us together."

Miss Sarah said that after the wills were drawn and executed, she, her mother, her father and Bascom discussed the provisions therein and agreed that the wills "carried out the contract" that her father made. She worked on the farm and garden, shucked corn, fed the pigs, milked the cows, and looked after her mother who was ill; but that during the last few years of the lives of her parents, Bascom took care of most of the work; that after the death of her mother, she did all the household work and some of the outside work; that Bascom looked after the hay and cut the corn, helped with the threshing and "nearly always did the plowing;" and that her father was quite unwell in his latter years, and after his return from a hospital, she had to wait on him so much that she was unable to take off her clothes for two or three weeks at a time.

As evidence of her advancements, Sarah exhibited the remnant of a note, dated in 1939, signed by J. W. Patton in which he agreed to pay to her "interest only" at the rate of 3% on $2,744.14 for something in connection with "land." Sarah said that the note covered the sum which she gave her father, in pursuance of their agreement, to enable him to make the final payment of the note secured by a lien on the farm. She also produced a note of $700.00, dated January 9, 1939, made by Patton and payable at the Bank of Speedwell, which she paid, and another note dated January 31, 1939, made by J. W. Patton, payable to Sarah J. Patton, in the sum of "$700.00 . . . . . . . . months after date." There is a notation on the latter note that it was for a note paid by Sarah for her father at the Bank of Speedwell.

Bascom and Sarah also testified that Bascom had made various advancements to their father, in accordance with their contract with the latter, amounting to more than $3,000.00, and, in addition, aided

his father in farming. Included in the above amount was $1,600.00 of the money of Bascom, included in his check for $2,000.00, which embraced $400.00 borrowed by him from his mother.

Sarah performed practically all of the household duties at her parents' home, and, according to the evidence, gave her undivided time and attention to the care of her mother and father until their respective deaths. As her parents advanced in age, they became more infirm in health. Her mother was ill for a long time, and her father had difficulty in moving about, and while he sometimes undertook supervisory work on the farm, he was unable to perform manual labor.

Bascom testified that he lived on the farm and looked after the livestock and farming operations until his father died, except for a portion of two years when he was operating a gasoline service station nearby. He said that during the time he was operating the station, and after he was married, he, nevertheless, from time to time visited the farm and aided his father. There is some evidence that he was addicted to the use of ardent spirits, and that his father was dissatisfied with his work to an extent; but, nevertheless, the agreement between them was not changed.

In October, 1944, J. W. Patton went to the office of his long-time friend and legal counselor, Joseph C. Shaffer, an attorney at law, at Wytheville, for a consultation concerning wills for himself and wife. Shaffer testified that Patton discussed the matter with him on different occasions; but he hesitated to write a will for Mrs. Patton when she was not present; but, that being somewhat familiar with the situation, he finally agreed to draft separate wills for them; that Patton told him he would never have been able to keep the farm if it had not been for money advanced by Sarah and Bascom; that if they had not stayed there and worked with him he would have lost it; that he and his wife had an agreement and understanding with themselves and Sarah and Bascom that wills for himself and his wife were to be drawn, carrying out an agreement with Sarah and Bascom for "advancements" made and work done by them; and that J. W. Patton gave him a description of the part of the farm that was to be devised to his two children, in accordance with his agreement. Asked the reason for the language in the will reading: "I have preferred Sarah J. Patton and C. Bascom Patton because of advancements heretofore made by them to me," Shaffer said that this did not include all the reasons Patton gave him for making that statement, and that the

language was his own, "from my (Shaffer's) standpoint, just a statement of fact in the will and not a statement of the conversation."

Shaffer further testified that he got the impression from J. W. Patton that Bascom had "contributed a pretty good sum at one time." He further testified that when J. W. Patton was talking about getting married a second time, he (Patton), inquired whether or not he could limit the interest of his intended second wife in his property, as he did not want her to have any of the McLauren Farm, but some other estate.

There is some indefinite testimony that at another time J. W. Patton discussed making a change in his will with reference to the property devised Hobert Patton, one of his sons.

It is also in evidence that Sarah and Bascom purchased a tract of land adjoining the McLauren Farm at the urging of their father, who told them that it would be well to buy the property adjacent to that which he and Mrs. Patton would devise to them.

R. L. Groseclose, a neighbor of J. W. Patton, and a witness to the will of Mrs. Patton, testified that at the time Mrs. Patton's will was being executed, mention was made about J. W. Patton's will, and Patton said that he had his will fixed too. The Pattons said that, "whichever one of them went first the other one was to carry on," and after the death of the survivor in each will, Sarah and Bascom were to get the front part of the home tract, pursuant to an agreement with Sarah and Bascom, whereunder the latter were to stay there and take care of their parents. Mr. and Mrs. Patton also told him that the above two children had helped them quite a bit in obtaining the property, and if it had not been for their help they never could have paid for it.

Groseclose further said that J. W. Patton was in bad physical condition during the last several years of his life; that he was unable to work and could not get around very well; that Sarah did the household work and helped feed the cattle; and that Bascom helped on the farm, doing the actual manual requirements.

S. T. Bennington, another neighbor, said that Patton told him he did not know what he would have done without Sarah's help and it would not be right for him to take the land from her and give it to others.

Carl Jennings testified that Sarah did all of the household work, and that he helped Bascom in the farm work.

J. C. Overstreet, who married one of the daughters of J. W. Patton, testified that Sarah did everything around the Patton home and both

Sarah and Bascom took care of their parents during the latter years of the life of each, and that when Mr. Patton and Bascom sometimes worked together, Mr. Patton was usually walking around.

Appellees, in the pleadings and testimony, admit that their father would have been justified in favoring Sarah and Bascom over his other children in the disposition of his estate. They minimize the contributions and services rendered by Bascom. They admit, however, that their father was a man of strong mind and free will, and that he had some reason for making the provision in his will favoring Sarah and Bascom.

Several grounds of defense are relied on. The first is that the terms of the alleged agreement are too uncertain and indefinite to be specifically enforced. The second is that the acts relied on by appellants in part performance did not refer to, result from, and were not made in pursuance of the agreement alleged; and, third, that the acts performed by appellants were but the expressions of their natural and normal desire to aid and assist their parents, in return for which they were furnished food, shelter and other necessities of life by their parents.

Courts accept with caution and examine with scrutiny evidence offered in support of an oral contract to dispose of property of a deceased person different from that provided by law. The evidence must be clear, definite and convincing. It must leave no reasonable doubt as to the terms and character of the agreement. The contract, however, may be shown by corroborating testimony, and all of the circumstances may be considered, including admissions of the deceased party, and statements and conduct of the promisee. When there is evidence tending to show the existence of a contract, proof of the terms of a will in conformity with such contract is confirmatory proof that the agreement was entered into. Courts of equity will not allow the statute of frauds to be used as an instrument of fraud. Acts of part performance relied on must be relevant solely to the contract sought to be enforced and consistent with no theory other than the existence of the alleged contract. Volume 5, Digest of Virginia and West Virginia Reports, (Michie) pages 79 to 82; Volume 3, Permanent Supplement, pages 380 to 381; Minor on Real Property, Second Edition, Ribble, Volume 2, § 1198, page 1598 and § 1207, pages 1607, 1608; 8 M. J., Statute of Frauds, § 35, page 801.

The principles upon which a court of equity will avoid the statute of frauds and enforce a parol agreement for the sale of land have been stated and restated by us time after time beginning with *Wright*

v. *Pucket*, 22 Gratt. (63 Va.) 370, 374, and continuing to *Everton* v. *Askew*, 199 Va. 778, 781, 782, 102 S. E. 2d 156.

In *Wright* v. *Pucket, supra*, the requisites are briefly and clearly stated:

"1st. The parol agreement relied on must be certain and definite in its terms. 2d. The acts proved in part performance must refer to, result from, or be made in pursuance of the agreement proved. 3d. The agreement must have been so far executed that a refusal of full execution would operate a fraud upon the party, and place him in a situation which does not lie in compensation. Where these three things concur, a court of equity will decree specific execution."

In the following cases all of the above requirements were held fulfilled: *Burdine* v. *Burdine*, 98 Va. 515, 36 S. E. 992, 81 Am. St. Rep. 741; *Williams* v. *Williams*, 123 Va. 643, 96 S. E. 749; *Cannon* v. *Cannon*, 158 Va. 12, 163 S. E. 405; *Clark* v. *Atkins*, 188 Va. 668, 51 S. E. 2d 222; *Wright* v. *Dudley*, 189 Va. 448, 53 S. E. 2d 29; and *Everton* v. *Askew, supra*.

In the following cases the requirements fell short: *Wright* v. *Pucket, supra; Hale* v. *Hale*, 90 Va. 728, 19 S. E. 739; *Plunkett* v. *Bryant*, 101 Va. 814, 45 S. E. 742; *Frizzell* v. *Frizzell*, 149 Va. 815, 141 S. E. 868; *Powell* v. *Tilson*, 161 Va. 318, 170 S. E. 750; *Pair* v. *Rook*, 195 Va. 196, 77 S. E. 2d 395; *Taylor* v. *Hopkins*, 196 Va. 571, 84 S. E. 2d 430; *Clay* v. *Clay*, 196 Va. 997, 86 S. E. 2d 812; *Dickenson* v. *McLemore*, 201 Va. 333, 111 S. E. 2d 416; and *Hill* v. *Luck*, this day decided, 201 Va. 586, 112 S. E. 2d 858.

The first requirement of the stated principles has here been fulfilled. The evidence abundantly shows that there was an oral agreement, and that its terms were certain and definite. Appellants were to assist their father in paying off his indebtedness, especially the balance due on his purchase of the McLauren Farm, and were to provide for and take care of Mr. and Mrs. Patton, rendering to them all needed personal and domestic services, in return for which Patton was to devise to appellants a designated part of the McLauren Farm, that is, the front or the lower part thereof, which is conceded to be the same as that specifically described in the wills of Mr. and Mrs. Patton. The admissions of J. W. Patton and the evidence of disinterested witnesses established the fact that the mutual and reciprocal wills of Patton and his wife were made in pursuance to the oral agreement. Patton's will makes it clear that he recognized the agreement, and that it was his intention to comply with it.

In *Williams* v. *Williams, supra*, we said:

"Proof of a testamentary compact may expressly appear in the language of the instrument, or it may be supplied by competent witnesses who testify to admissions of the testators, or it may result as an implication from the circumstances and relations of the parties and what they have actually provided for by the instrument. Direct evidence is not necessary." 123 Va. pages 649, 650.

We come next to the second requirement.

Sarah Patton divested herself of practically all of her property to assist her parents, and served them faithfully, looking after their health, safety and comfort. While her brother, Bascom, did not render as complete service as his sister, his monetary contribution and his attention to his parents were in substantial performance of his promise. The monetary contributions of the two necessarily made a substantial change in their worldly possessions. The personal services rendered by them changed their normal mode of life. They gave in material things and in personal service more than filial love and devotion demanded of them.

The evidence of Shaffer and Groseclose is entitled to weight. It corroborates the testimony of the appellants and is not contradicted by any evidence in the case. The notes and papers introduced in evidence confirm the contributions made by Sarah, and no one disputes the monetary advancement made by Bascom. The provision in the will of J. W. Patton in favor of appellants is in conformity with the established oral agreement with his two children, and not merely an expression of his desire that the designated real estate be given to appellants in appreciation of their aid. The contributions and services of appellants were, under the undisputed circumstances, of such character, nature and extent as to force the conclusion that they grew out of, referred to, and were given and rendered in pursuance of the contract proven.

It is evident that the agreement was so far executed by appellants that a refusal to grant them relief would operate a fraud upon them, would place them in a situation in which they could not now be justly compensated, and would deny the demands of equity and the wishes of their father.

Having reached the conclusion that appellants are entitled to the enforcement of their contract, it is not necessary to consider or discuss further contentions made by them in support of their right to relief.

For the reasons stated, we hold that the trial court correctly ruled that J. W. Patton died intestate, and that it erred in denying appellants

the right to a specific performance of the contract with their father to devise to them his undivided three-fifths interest in that specific parcel of land described in the third paragraph of his revoked will.

Accordingly, the decrees of July 25, 1957, and February 6, 1959, are affirmed in part, and reversed in part, and this cause remanded to the trial court for such further proceeding as may be necessary and proper in accordance with the views herein expressed.

*Affirmed in part; reversed in part; and remanded.*