## Richmond

### Benjamin H. Woodbridge, Jr., Et Al., Etc., Et Al. v. Wallace James Outland, Et Al.

September 1, 1971.

Record No. 7563.

Present, All the Justices.

*Vernon M. Geddy, Jr. (Stephen D. Harris; Geddy, Baker & Harris,* on brief), for appellants.

*Bryan B. Palmer,* for appellees.

I'Anson, J., delivered the opinion of the court.

Plaintiffs, Wallace James Outland and Billie Mae Outland, instituted suits in the Circuit Court of James City County and in the Circuit Court of York County against the defendants, Benjamin H. Woodbridge, Jr., and Martin V. B. Bostetter, Jr., administrators of the estate of Geneva Mae Pettitt, deceased, and the heirs at law of the decedent, seeking specific performance of an oral contract allegedly made by Mrs. Pettitt to devise to them approximately eight acres of land, with the improvements thereon, lying partly in James City County and partly in York County.

The suits were consolidated for trial in the Circuit Court of James

City County. After an *ore tenus* hearing, the chancellor granted specific performance of the oral contract as to a part of the land sought by plaintiffs, denied specific performance as to the remainder of the land sought, and awarded a judgment against the administrators of the estate for the amount of rent paid by plaintiffs for that part of the property occupied by them subsequent to the death of the decedent. We granted defendants an appeal.

The controlling question presented on this appeal is whether the proof offered by plaintiffs established an agreement between them and Geneva Mae Pettitt, as alleged in their bill of complaint, which may be specifically enforced in a court of equity.

The evidence shows that Geneva Mae Pettitt died intestate in 1966, seised of land which is the subject of this suit. The land lies between U. S. Route 60 and the C. & O. Railway track, near the village of Lightfoot, Virginia. Improvements on the land consist of a brick home and a garage near the railway right of way, which home was occupied by Mrs. Pettitt at the time of her death, a two-story frame house known as the "old home place," a stable for ponies and horses, a fence, and a "duck pond" situated near the northern boundary of the property.

The Outlands and Mrs. Pettitt had been close friends since 1947. In early 1960 the Outlands had to vacate their home in Newport News and were looking for a place to live in the country. They testified that Mrs. Pettitt offered to make improvements to the "old home place" and leave to them at her death all of her property situated between Route 60 and the railroad track if they would move to the old home place, take care of the property, and look after her until she died. Because of their faith in Mrs. Pettitt's promise and their fondness for her, the Outlands moved into the home in April 1960 after she had made extensive improvements. At that time the house was under a lease to one Benny Newman, who had surrendered possession, and the Outlands paid Newman $35.00 per month rent until his lease expired. Thereafter they paid $35.00 per month rent to Mrs. Pettitt, and after her death they paid the rent to the administrators of her estate. The stable and fence on the property were erected by Outland with Mrs. Pettitt's permission.

Mr. Outland testified that, in keeping with the agreement with Mrs. Pettitt, he performed varied and numerous services for her. He maintained Mr. Pettitt's grave, cut grass, pruned trees, tended the rose bushes and shrubbery, repaired the well, ran electric wires from Mrs. Pettitt's home to his and installed a buzzer in his home so she

could call him at any time in case of an emergency. These and many other chores necessitated his giving up his job in structural steel work and finding employment in a local welding shop. Mrs. Outland assisted Mrs. Pettitt in spraying her roses, watering the flowers, writing checks, fixing her meals, and she otherwise tended to Mrs. Pettitt's needs following her illness in 1964.

A number of witnesses called by plaintiffs testified concerning conversations they had had with Mrs. Pettitt relative to her leaving property to the Outlands upon her death. However, the testimony of the witnesses was not specific as to just which property Mrs. Pettitt had reference. Other witnesses, close friends of Mrs. Pettitt, including one to whom she had given some property, testified that she had told them she was going to improve the home place so the Outlands could move in but that she did not mention an agreement to leave the Outlands any property in consideration of their moving there.

In December 1965, shortly before Mrs. Pettitt's death, a local minister and Donald R. Taylor, Mrs. Pettitt's attorney, discussed with her the terms of a will she desired to have drawn, primarily with respect to a trust to be established for the benefit of the minister's church.

The minister testified that Mrs. Outland performed many services for Mrs. Pettitt and that Mrs. Pettitt felt very close to her. She told him she was leaving the home place to the Outlands when she died. He was not present when the provisions of the proposed will concerning the Outlands were discussed by Mrs. Pettitt and Taylor. A rough draft of the will prepared by Taylor was in accordance with his understanding with Mrs. Pettitt relating to the gift to the church.

Taylor had two conferences with Mrs. Pettitt pertaining to the provisions of her will. He gathered from those conferences that Mrs. Pettitt had asked plaintiffs to move onto her property and had agreed to make certain improvements to it for their benefit, but at no time during the conference did Mrs. Pettitt mention an agreement to devise any property to the Outlands in consideration of their moving to the old home place. He prepared a rough draft of the will for Mrs. Pettitt following his conferences with her, and he testified that the draft was "my understanding * * * of her desires and wishes in the matter." The language of the draft with respect to the Outlands began: "In appreciation and deep regard for my beloved friend, Wallace Outland, and his wife, I do hereby direct and empower and authorize my executor, as hereinafter named, to permit the said Wallace Outland, and wife, to remain in possession of the dwelling

house located next to my present residence, as long as they, or the survivor thereof, shall live * * *."

Taylor and Mrs. Pettitt considered having a survey made to separate the land on which the two houses were built. It was his understanding that Mrs. Pettitt intended to leave the "old home place" and the duck pond to the Outlands for life, and he drafted the will with that understanding.

Following the qualification of Benjamin H. Woodbridge, Jr., and Martin V. B. Bostetter, Jr., as administrators of Mrs. Pettitt's estate, they visited the property and talked with Mrs. Outland, who asked, "what, if any, arrangements she and her husband could make to buy the home in which they were living?" In this conversation Mrs. Outland made reference only to the house which she was occupying and made no reference to the brick dwelling, and in no way inferred that she and her husband had any interest in the property other than as tenants. No claim was made by plaintiffs until this suit was brought, and Bostetter testified that the Outlands paid him $35.00 per month rent up until the date of the trial of this suit.

After hearing the evidence, the chancellor, in a letter to counsel, referred to the ambiguity in the evidence as to what part of the property Mrs. Pettitt intended to devise to the Outlands. He stated that under the peculiar circumstances he was exercising his discretion in apportioning the property. Otherwise he would have to deny plaintiffs' claim which he believed to be supported, at least in part, by the evidence, or grant the entire tract, which, according to much of the credible evidence, was not Mrs. Pettitt's intention. Hence he had decided to put the plaintiffs on terms to accept a monetary award for the reasonable value of their services, or to receive the property excluding the eastern portion thereof on which the brick home and garage were situated.

A valid oral contract to devise property may be enforced against the estate of a decedent, as any other contract; but courts examine such contracts with caution and carefully scrutinize the evidence offered in support thereof. *Blincoe* v. *Blincoe*, 209 Va. 238, 244, 163 S.E.2d 139, 143 (1968); *Patton* v. *Patton*, 201 Va. 705, 714, 112 S.E.2d 849, 856 (1960).

We have many times stated the principles upon satisfaction of which a court of equity will decree specific performance of an alleged oral contract to convey or devise real property, despite the statute of frauds. As early as *Wright* v. *Pucket*, 63 Va. (22 Gratt.) 370, 374 (1872), it was said:

"1st. The parol agreement relied on must be *certain and definite* in its terms. 2d. The acts proved in part performance must refer to, result from, or be made in pursuance of the agreement proved. 3d. The agreement must have been so far executed that a refusal of full execution would operate a fraud upon the party, and place him in a situation which does not lie in compensation. Where these three things concur, a court of equity will decree specific execution. Where they do not, it will turn the party over to seek compensation in damages in a court of law."

See also, *Patton* v. *Patton, supra,* 201 Va. at 714-15, 112 S.E.2d at 856, and the numerous cases there collected.

In considering the first of the three principles, we said in *Hill* v. *Luck,* 201 Va. 586, 590, 112 S.E.2d 858, 860 (1960), that the alleged agreement not only must be established by full, clear and convincing proof, but it must be definite, certain and unequivocal in all its terms. It must be so precise that neither party could reasonably misunderstand its terms. If the terms of the agreement are vague and uncertain, or the evidence is insufficient to establish the contract, a court of equity will not lend its aid to enforce it and will leave the party to his legal remedy, if there be any.

In the instant case, plaintiffs have not established by clear and convincing proof an oral agreement certain and definite in its terms. Indeed, the chancellor found that the evidence was not clear and unequivocal as to what part of the property Mrs. Pettitt intended to devise to the Outlands. In decreeing specific performance as to a part of the land the chancellor enforced a contract differing materially from that alleged. He held, in effect, that the plaintiffs failed to prove by clear and convincing evidence the existence of the alleged oral contract, the terms of which could not be reasonably misunderstood.

We hold that, under the evidence presented, the terms of the alleged oral contract are so vague and uncertain that it was error to grant specific performance as to any part of the property. Hence the plaintiffs are left to their legal remedy, if there be any.

For the reasons stated, the "judgment order" is reversed and the plaintiffs' bill dismissed.

*Reversed and final decree.*