## Staunton

ALICE GODFREY BLINCOE, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF JOHN GOLDEN BLINCOE, AND AS ADMINISTRATRIX C.T.A. OF THE ESTATE OF MARY FITZHUGH BLINCOE v. EDNA BLINCOE, INDIVIDUALLY AND AS TRUSTEE FOR THE USE AND BENEFIT OF HERSELF AND JUANITA BLINCOE PINGEL, JAMES BLINCOE, THOMAS J. BLINCOE AND DAVID M. BLINCOE.

September 6, 1968.

Record No. 6770.

Present, Eggleston, C.J., Buchanan, Snead, I'Anson, Carrico and Gordon, JJ.

*John H. Rust* for appellant.

*Paul D. Scanlon* for appellees.

GORDON, J., delivered the opinion of the court.

This appeal involves the disposition of the estate of Mary Fitzhugh Blincoe, a Virginia resident who died in April 1965. Under her will dated February 20, 1945, which was probated by the Clerk of the Circuit Court of Fairfax County, the decedent bequeathed $500 to her son Thomas Marbury Blincoe and left the balance of her estate to her other son John Golden Blincoe. The trial court held, however, that the decedent in July 1958 had entered into an enforceable contract to make a will benefiting Thomas's wife, Edna Blincoe, and Thomas's and Edna's children. The question presented is whether the evidence supports the court's decree, which embodied that holding and ordered specific performance of the contract.

In the bill of complaint Edna Blincoe alleged that she had married Thomas Marbury Blincoe in 1929, but had learned in 1958 that the marriage was not legal because Thomas was still married to his first wife, Blanche. Edna alleged that in July 1958 she had advised the decedent, Mary Fitzhugh Blincoe, that she (Edna) had no legal obligation to care for Thomas (who was an invalid and dependent upon Edna for support) and they "could no longer in conscience or law live together".

The contract then allegedly made between Edna and Mary Fitzhugh was described by these words of the bill of complaint:

" . . . That decedent, Mary Fitzhugh Blincoe, promised to leave half of her estate to Thomas Blincoe and Edna Blincoe in consideration of which promise to leave half of the estate to Edna and Thomas Blincoe, Thomas and Edna Blincoe agreed to remain in Illinois and Edna Blincoe agreed to provide the full support of Thomas Blincoe.

" . . . That a further part of the agreement was that in consideration for being bequeathed half of Mary Fitzhugh Blincoe's estate, Thomas and Edna Blincoe would remarry legally when free to do so, to relieve Mary Fitzhugh Blincoe of any legal responsibility for support of Thomas Blincoe or her grandchildren by Edna Blincoe and Thomas Blincoe."

Edna alleged that "in April 1961 decedent, Mary Fitzhugh Blincoe

reiterated in specific terms her promise to leave half of the estate to Thomas and Edna Blincoe", and that in 1962 and subsequent years Mary Fitzhugh made statements confirming her intention to provide for either Thomas and Edna Blincoe or Thomas and his family.

Edna further alleged that she and Thomas were remarried after he was divorced from his first wife under a Mexican decree, and that she (Edna) had provided "full support" for Thomas until his death on March 19, 1966.

Edna prayed the court to establish the contract between Mary Fitzhugh and her and to decree that she (Edna) "is the owner of and entitled under [sic] distribution to her, individually and as representative of the estate of Thomas Blincoe, of one half of the estate of Mary Fitzhugh Blincoe, deceased . . .".

To support the allegations of her bill Edna produced before the judge, who heard the evidence *ore tenus*, the testimony to be described in the succeeding paragraphs.

Thomas Marbury Blincoe left his parents' home in Virginia around 1916, when he was 17 years old, and resided outside the State for the remainder of his life. Thomas married Edna in 1929, and they lived thereafter in Illinois as man and wife. In 1956 Thomas suffered a paralytic stroke, after which he was dependent upon Edna for his support. In July 1958, when a child of the union between Thomas and his first wife Blanche visited Thomas's and Edna's home, Edna learned that Thomas was still married to Blanche.

The day after Edna learned that her marriage to Thomas was invalid, she drove to Mary Fitzhugh Blincoe's home, accompanied by Thomas, their son James, their daughter Juanita Pingel and their son-in-law Lawrence Pingel. Mary Fitzhugh was then a widow living with her unmarried son, John Golden Blincoe, on a farm in Virginia, which she owned and Golden had managed for many years.

Edna, when she confronted Mary Fitzhugh, spoke of the "tragedy" for her family and for Blanche's family. "Here I have a family of four children. The other woman had three children." Edna complained that Mary Fitzhugh had not advised her of Thomas's bigamy. Mary Fitzhugh responded that her attorney had advised her "not to tell you [Edna] or even let you in the house; because this would make us liable for the support of your children". Edna then said to Mary Fitzhugh: "You keep him [Thomas] and take care of him. I have small children; and I have to work. He's an invalid; and so you keep him here."

Then Mary Fitzhugh said: "Edna, don't let this disgrace come out. You take him back to Illinois; and I will see that you will have whatever is left . . . I don't know how much I will have when I'm gone; but whatever there is here, I will see that you are compensated for taking care of him if you will take him back and don't let this disgrace come out."

Later in her testimony about the conversation with Mary Fitzhugh in July 1958, Edna said: "So, she [Mary Fitzhugh] promised me then that she would take care of my children and myself if I would take care of him. * * * I said to her that I would take him back. . . . 'I'm not promising to say that he's going to get a divorce.' " When asked whether she recalled any statement made by Mary Fitzhugh regarding a divorce, Edna replied: "Yes; she [Mary Fitzhugh] was real concerned; and she said; 'Well, Edna, I hope that you get this situation ironed out.' "

Juanita Pingel, who was present during this confrontation, testified that Edna said to Mary Fitzhugh: "You keep him, Mary. . . . I've lived with him for 30 years. . . . I've been a good wife to Tom. You see the condition he's in. . . . I've worked for him. I've raised my children; and I've been a good wife; and now you keep him." According to Juanita, Mary Fitzhugh replied: "No, Edna. . . . Nobody knows that Tom is alive. We told them he was dead. You take him back to Illinois with you; and I will take care of you and the children and I'll make up to you for the wrong I've done to you." Juanita also testified that Mary Fitzhugh said to her father, "Tom, I forgive you and I'll make it up to you".

James Blincoe, who was also present during this confrontation, said that his mother (Edna) asked why Mary Fitzhugh had not told her that Thomas "had left a wife [Blanche] and two children in New York". According to James, Mary Fitzhugh replied that "they wanted to protect the family name; and they did not want to have the scandal in Virginia". Then, James testified: "She [Mary Fitzhugh] said that she was exceedingly sorry that this whole situation had arisen; because my mother told her that she was thinking very seriously of leaving my dad and leaving him there at the home, with Golden and his mother. And she said; 'No, don't. Please don't. I'll make it up to you, Edna. I'll take care of you and Tom and the kids; but please don't—the scandal—we can't afford a thing like this.' "

In April 1961 Thomas was divorced from his first wife, and he and Edna were remarried. Shortly thereafter they and their son

David visited Mary Fitzhugh at the nursing home in Fairfax County where Mary Fitzhugh then lived. Edna testified that Mary Fitzhugh was elated by the news of the divorce and remarriage. According to Edna, Mary Fitzhugh said that "they had sold the back land off their farm, and that there would be more money than she needed to take care of her; and that I shouldn't worry—that there would be ample funds left to take care of myself and take care of my husband and finish raising my family".

Referring to the same conversation in April 1961, David Blincoe said, "she [Mary Fitzhugh] said that she was going to take care of my mom in the estate; and that she was going to see that she got an equal share". When asked whether Mary Fitzhugh had referred "to anyone else getting a share in the estate", David answered: "Well, yes. She said that my mom would get an equal share along with my dad."

In 1962 Edna and Thomas, their son Jerome, their daughter-in-law Shirley and their granddaughter Sharon visited Mary Fitzhugh at the nursing home. When asked whether she recalled what Mary Fitzhugh had said during this visit, Edna replied: "Yes. Again in '62 she had brought up her estate; and again at this time she reassured me that I would get half of the estate to take care of my family."

Referring to the same conversation, Jerome testified that Mary Fitzhugh had said: "[S]he would keep her promise to Edna Blincoe * * * that anything she had would be left to her heirs". When asked whether Mary Fitzhugh had specified how her property would be left to her heirs, Jerome answered: "Yes. She said to [Thomas] Marbury and Edna and the kids".

Referring to the same conversation, Shirley Blincoe testified that Mary Fitzhugh had said: "She was very pleased that mom and dad had made up their differences in their marriage. Dad had gotten everything straightened out; and she was happy that dad had such a nice family—and that she would take care of everybody. . .".

Edna testified that she had visited Mary Fitzhugh on four occasions after 1962 and before Mary Fitzhugh's death in April 1965. According to the evidence Mary Fitzhugh made statements relating to the disposition of her estate only during visits in 1964 and 1965.

During Edna's visit in the summer of 1964, Mary Fitzhugh referred to the fact that Golden had been married in the fall of 1963. Then, according to Edna, "she [Mary Fitzhugh] again reassured me because Golden got married I had nothing to worry about; that

everything would be equally divided between us". Edna testified that her son David was with her on this visit, but David testified that he was not.

David Blincoe testified that when he visited Mary Fitzhugh with his mother and father in April 1965, "she [Mary Fitzhugh] had said that she was glad to see us and that she had taken care of my mother and my father, in her Will; and she said that my mother and father would receive half of her estate". Edna made no mention of that statement in her testimony.

Edna and members of her family also repeated statements made by Golden respecting the disposition of Mary Fitzhugh's estate. As examples, Edna testified that during the April 1961 visit Golden said to Thomas, " 'Edna and your kids will be taken care of' "; and Jerome Blincoe testified that after Mary Fitzhugh's funeral Golden said to Thomas, " 'there is no need of you staying here to have the will probated; because I'll make sure you get your half' ".[1]

Thomas Marbury Blincoe died on March 19, 1966. Edna Blincoe instituted this suit on April 6, 1966, naming John Golden Blincoe, individually and as the executor of the estate of Mary Fitzhugh Blincoe, as the party defendant. John Golden Blincoe died on May 18, 1966, and his widow, Alice Godfrey Blincoe, qualified as executrix of his estate and as administratrix c.t.a. d.b.n. of the estate of Mary Fitzhugh Blincoe. By a decree entered June 3, 1966, Alice Godfrey Blincoe, individually (she being the sole beneficiary under the will of John Golden Blincoe) and in the capacities mentioned in the preceding sentence, was substituted as the party defendant in this suit.

Following closing argument by counsel, the trial judge announced his decision: " . . . I believe there was a contract in 1958. I think that [the] consideration was a valid one and I think the defendant, Edna Blincoe, performed her part. It is true that in 1958 what Mary Fitzhugh Blincoe meant was ambiguous but I think she straightened out that ambiguity in 1962 and stated what she meant."

By the final decree entered May 11, 1967, from which this appeal

[1] In 1960 Mary Fitzhugh Blincoe appointed John Golden Blincoe as her attorney in fact under a written power of attorney. Counsel for the appellee attaches particular importance to the statements of John Golden Blincoe set forth in the text respecting the disposition of Mary Fitzhugh Blincoe's estate, because John Golden Blincoe had been appointed her attorney in fact. In our opinion John Golden Blincoe's statements and his appointment as attorney in fact are not material to the question before us.

was taken, the court directed Alice Godfrey Blincoe, as administratrix c.t.a. of the estate of Mary Fitzhugh Blincoe, to pay one-half of the net value of the personal estate to "Edna Blincoe, as Trustee, for the use and benefit of herself [and Thomas's and her four children]". The court further directed Alice Godfrey Blincoe to convey a one-half interest in all real estate devised to John Golden Blincoe under Mary Fitzhugh Blincoe's will and held by Alice Godfrey Blincoe on the date of the institution of this suit to Edna Blincoe, as Trustee for the use and benefit of the same persons.

We must "accept with caution and examine with scrutiny" the evidence proffered by Edna Blincoe in support of an alleged oral contract providing for the disposition of the decedent's estate contrary to the directions of her probated will. See *Patton* v. *Patton*, 201 Va. 705, 714, 112 S.E.2d 849, 856 (1960). And we can uphold the trial court's decree only if Edna sustained her burden of bringing forth clear, definite and convincing evidence that with reasonable certainty established the making of the contract and proved its terms. See *id.;* 1 *Page, Wills* § 10.5, at 450 (Bowe-Parker ed. 1960).

By her bill of complaint Edna asked the court to establish and enforce a contract made between Mary Fitzhugh and her in July 1958. Edna alleged that Mary Fitzhugh then agreed to leave half of her estate to Thomas and Edna, in consideration of which Edna agreed that she and Thomas would remain in Illinois, that she would support Thomas, and that, when free to do so, she and Thomas would remarry to relieve Mary Fitzhugh of any legal responsibility for supporting Thomas or Thomas's and Edna's children.

Edna attempted to prove this contract by her testimony and the testimony of her children Juanita and James concerning the July 1958 conversation. But according to their testimony, Mary Fitzhugh then merely agreed to compensate Edna for taking care of Thomas, or to take care of Edna and her children if she would take care of Thomas, or to "make it up" to Edna and Thomas, or to take care of Edna, Thomas and the "kids". So the testimony upon which Edna relies not only fails to prove the contract alleged in the bill, it shows affirmatively that there was no meeting of the minds respecting essential terms—the amount to be paid or bequeathed by Mary Fitzhugh and the persons to whom the payment or bequest would be made.

The trial judge held that the contract was ambiguous when made in 1958, but that Mary Fitzhugh eliminated the ambiguity in 1962

by stating what she had meant in 1958. We disagree with this holding for two reasons.

First, we do not have a case of mere ambiguity; the evidence does not show that the parties reached an understanding in 1958 respecting essential terms of the agreement.

Second, the evidence does not show that Mary Fitzhugh made those essential terms clear by her statements in later years.[2] According to Edna's testimony, Mary Fitzhugh described the terms differently during the 1961, 1962 and 1964 visits (assuming Mary Fitzhugh's words in those years should be interpreted as referring back to an agreement made in 1958, rather than as only referring to the persons who would be the natural objects of her bounty under her will). Moreover, members of Edna's family, who testified about Mary Fitzhugh's statements on those occasions, contradicted Edna and each other.

The testimony brought forth by Edna did not constitute clear, definite and convincing evidence that proved the terms of the alleged contract with reasonable certainty. We hold therefore that Edna failed to prove by requisite evidence the contract to make a will alleged in her bill of complaint or the different contract specifically enforced by the trial court or, indeed, any enforceable contract to make a will. This holding makes it unnecessary for us to consider the other issues raised by the appellant, Alice Godfrey Blincoe.

Our order will reverse the final decree entered by the trial court and will dismiss the bill of complaint.

*Reversed and final decree.*

---

[2]Since Edna Blincoe sought in this suit to enforce a contract made in 1958 and her evidence does not show that the parties then reached an understanding respecting essential terms of the contract, it is questionable that any subsequent statements of the parties or either of them could be used to fix those terms. However, we need not decide that question, which was not raised by counsel.