PRESENT: All the Justices

MARION CASEY DEAN, CO-EXECUTOR AND
CO-TRUSTEE, ET AL.

                                              OPINION BY
v.    Record No. 131512              JUSTICE CLEO E. POWELL
                                              April 17, 2014
BARBARA MORRIS, ET AL.

                 FROM THE CIRCUIT COURT OF ORANGE COUNTY
                     Joanne F. Alper, Judge Pro Tempore

     This appeal arises out of breach of contract suit brought

against the estate of Marion Casey Dean ("Casey").  In this

case, we hold that the trial court's finding that an oral

contract existed between Casey and his wife, Shirley Gregg Dean

("Shirley"), is without clear and convincing evidence to support

it.  Therefore, we will reverse the judgment of the trial court.

                    I.  FACTS AND PROCEEDINGS

     Shirley married Casey on July 1, 1978.  Both had children

from their previous marriages.  When Shirley and Casey married,

they initially lived in Shirley's townhouse until it became too

small, at which time they sold it and used the proceeds to

purchase a larger townhome in the same community.  After Casey

sold his business to his son, Marion Casey Dean, Jr. ("Dean"),

Casey and Shirley sold the townhome, remodeled Casey's farmhouse

in Orange County, and moved there.

     Shirley died in August 1999.  At the time, Barbara E.

Morris ("Morris"), Linda D. Gregg ("Gregg"), and Joanne Sundell

decided not to probate their mother's estate.  Their decision

                                1

was based on their belief that their mother had an oral contract with Casey for him to provide for them in his will. Morris claimed that she and her sisters remained close to Casey after their mother died.

After Casey's death in 2010, Morris and her sisters unsuccessfully attempted to get Casey's estate documents from Dean. When Morris contacted the estate's attorney, she was told that she should have her attorney contact him. Morris then hired an attorney. Subsequently, the sisters reported receiving a check for $200,000 accompanied by a release. Morris indicated that they did not cash it because they still had not seen any of the estate paperwork.

The sisters then sued Casey's estate for breach of an oral contract between him and their mother. At trial, Morris testified that she and her mother had discussed her mother's estate planning desires. Specifically, Morris testified that in 1996 because of her ailing mother's upcoming surgery, Shirley told Morris that "Casey and I have discussed . . . asking you all to wait until after something happens to him, before you all inherit anything from me, before you get anything from the estate." Morris stated that Shirley told her that she and Casey had agreed that Morris and her sisters would inherit more if they waited until after Casey's death. Morris further testified that in May 1997, Shirley "mention[ed] something about the

2

widow's third."

Morris also testified about a conversation that she had with Casey approximately a week and a half after her mother died. She stated that Casey spoke privately with her and showed her a document that she did not read. Casey told her that the document, which he kept in the safe, would not mean much to her then but that it would after he died, and that he was showing her because he wanted to be sure that his wishes regarding his estate were followed.

On cross-examination, Morris admitted that her mother did not tell her how much they would inherit if they waited and that Casey never told her not to probate her mother's will. She also admitted that her mother gave her a copy of her will around the same time that she had the conversation about her agreement with Casey.

Gregg testified that in December 1996 she spoke with her mother, who told her that she and Casey had made an agreement for her daughters to wait to inherit until after he died.

Frank Andrew Thomas, III, an attorney who previously represented Casey, testified as to several letters he wrote to Casey regarding estate work he did for Casey and a note in his file memorializing a meeting with Casey and Dean. In one letter dated December 31, 1996, Thomas wrote "I note that your current trust has a one third - two thirds division of assets between

3

your family and your wife's family.  The irrevocable trust I have drafted contemplates its asset will be distributed only to your family.  A modification can easily be made."  Approximately one month later, Thomas wrote,

> [e]nclosed with this letter please find a new draft of your irrevocable trust incorporating the amendments we discussed by telephone.  It now follows essentially the same scheme as your existing trust for the distribution of assets after your death.

In a letter dated October 18, 1999, Thomas wrote

> I want to go back over with you in this letter our discussions and plans regarding the administration of your wife's estate. Based on what you told me, I do not think there is anything that is needed to be done to administer your wife's estate. It appears that what property you have together was joint and there was nothing in her name alone that requires the probate of her Will or qualification of an Executor.  Should that turn out not to be the case, we can arrange for you to do so in a fairly simple fashion.

The trial court held that Morris "carried [the] burden of clear and convincing evidence to prove that there was such an agreement that [Shirley's] children be entitled to a third of the estate."  This appeal follows.

## II.  ANALYSIS

Dean argues that the trial court erred in finding clear and convincing evidence of an oral contract between Casey and

4

Shirley to leave one-third of Casey's estate to Shirley's children if Shirley predeceased Casey. To prove a breach of an oral contract, Morris must first prove that a valid oral contract existed. To prove a contract's existence, all of the essential elements must be proven. "[T]here must be a complete agreement which requires acceptance of an offer, as well as valuable consideration." Montagna v. Holiday Inns, Inc., 221 Va. 336, 346, 269 S.E.2d 838, 844 (1980)(citation omitted).

In reviewing the trial court's finding that clear and convincing evidence of the contract existed, "[w]e must 'accept with caution and examine with scrutiny' the evidence proffered by [the proponent] in support of an alleged oral contract providing for the disposition of the decedent's estate contrary to the directions of [his] probated will." Blincoe v. Blincoe, 209 Va. 238, 244, 163 S.E.2d 139, 143 (1968) (citation omitted). Only if the proponent has sustained her burden of putting on "clear, definite and convincing evidence that with reasonable certainty established the making of the contract and proved its terms," will we affirm the trial court's determination that an oral contract existed. Id.

To determine whether the trial court correctly held that there was an oral contract between Shirley and Casey, we first look to whether there was an agreement. In reviewing a trial court's determination that an oral contract existed, we review

5

the record for clear and convincing evidence, i.e., proof that is more than a mere preponderance but less than beyond a reasonable doubt.  Fred C. Walker Agency, Inc. v. Lucas, 215 Va. 535, 540-41, 211 S.E.2d 88, 92 (1975).

> "In testing the credibility and weight to be ascribed to the evidence, we must give trial courts and juries the wide discretion to which a living record, as distinguished from a printed record, logically entitles them.  The living record contains many guideposts to the truth which are not in the printed record; not having seen [the witnesses] ourselves, we should give great weight to the conclusions of those who have seen and heard them."

Id. at 541, 211 S.E.2d at 93 (quoting Bradley v. Commonwealth, 196 Va. 1126, 1136, 86 S.E.2d 828, 834 (1955)).

Gregg testified without objection that there was an agreement between her mother and Casey.  Morris further testified that her mother believed that there was an agreement between herself and Casey.  Thus, upon review, the record contains clear and convincing evidence to support the trial court's determination that an agreement existed.

Simply because the evidence is clear and convincing to prove that an oral agreement existed, however, does not mean that the evidence is sufficient to prove the terms of that agreement.  Without specificity of terms, there is no contract. Indeed,

[i]n Mullins v. Mingo Lime [& Lumber] Co., 176 Va. 44, 49, 10 S.E.2d 492 [(1940)], we [explained] as follows: "It is a necessary requirement in the nature of things that an agreement in order to be binding must be sufficiently definite to enable a court to give it an exact meaning."

. . . .

"Another essential element of a valid contract is certainty and completeness. The element of completeness denotes that the contract embraces all the material terms; that of certainty denotes that each one of those terms is expressed in a sufficiently exact and definite manner. An incomplete contract, therefore, is one from which one or more material terms have been entirely omitted. An uncertain contract is one which may, indeed, embrace all the material terms, but one of them is expressed in so inexact, indefinite or obscure language that the intent of the parties cannot be sufficiently ascertained to enable the court to carry it into effect."

"While a contract to be valid and enforceable must be so certain that each party may have an action upon it, reasonable certainty is all that is required. So where a contract is to some extent uncertain and ambiguous, it may be read in the light of surrounding circumstances, and if, reading it thus, its meaning may be gathered, the same will be enforced. But an agreement, in order to be binding, must be sufficiently definite to enable a court to give it an exact meaning, and must obligate the contracting parties to matters definitely ascertained or ascertainable."

. . . .

"In order that there may be an agreement, the parties must have a distinct intention common to both and without doubt or

7

difference.  Until all understand alike, there can be no assent, and, therefore, no contract.  Both parties must assent to the same thing in the same sense, and their minds must meet as to all the terms.  If any portion of the proposed terms is not settled, or no mode is agreed on by which it may be settled, there is no agreement, . . . ."

Smith v. Farrell, 199 Va. 121, 127-28, 98 S.E.2d 3, 7-8 (1957)(citations omitted).

In fact, in a prior case considering an oral contract as to how to dispose of an estate, this Court reversed the trial court's determination that there was sufficient evidence to prove the essential terms of an oral contract.  Blincoe, 209 Va. at 244-45, 163 S.E.2d at 144.  The record in that case contained clear and convincing evidence that the defendant promised to compensate the plaintiff but fell short of proving by clear and convincing evidence "that there was [a] meeting of the minds respecting essential terms--the amount to be paid or bequeathed by [the defendant] and the persons to whom the payment or bequest would be made."  Id.

Here, although Thomas' letters to Casey tend to indicate that Casey initially intended before and around the time of Shirley's death to leave one-third of the trust assets to her daughters and two-thirds to his own children, these letters are not clear and convincing evidence of the terms of the agreement. Indeed, although the trial court found there was sufficient

8

evidence that the daughters were entitled to "one-third of the estate," its very ruling indicates that the agreement was not sufficient as to the terms. Specifically, during the liability portion of the bifurcated trial, the trial court stated:

> I think . . . that the plaintiff has carried its burden of clear and convincing evidence to prove that there was such an agreement that [Shirley's] children be entitled to a third of the estate.
>
> The question that hasn't been answered yet is: What is the estate? And I think that's . . . the next issue. Was it a third of what was put in that trust, which vacillated, and maybe nothing? Was it a third of his entire estate, regardless of the provisions of the trust? <u>I'm not sure we have the answer to that</u>.

(Emphasis added.)

The trial court's uncertainty is borne out by the documents themselves. In 1996, Casey drafted a will and accompanying trust. That will left all of his tangible personal property to his children and left the "residuary estate" to be passed through the trust, which was to be divided two-thirds to his children and one-third to Shirley's children. The trust itself was unfunded at that time. Therefore, clearly in 1996, when Shirley told her children about the agreement, there was no evidence of an agreement that they would receive one-third of the estate because certain items had been specifically devised to Casey's children.

9

The fact that there was no evidence of a specific agreement as to terms is also borne out by the fact that even during Shirley's lifetime, the assets shuffled. In 1997, three parcels of property were placed into the previously unfunded revocable trust.

Adding to the confusion as to what corpus Shirley's children would receive one-third of is the fact that an irrevocable trust was also established. That trust was originally drafted by Thomas to pass all of its assets to Casey's children. It appears from correspondence that this trust was later drafted to provide a one-third/two-thirds division but this trust was funded with only $1.

However, any evidence about a one-third/two-thirds division simply sheds light on what Casey may have been thinking when he initially drafted his trusts.[*] It does not provide any evidence that Shirley and Casey agreed with each other that there would be a one-third/two-thirds division. There simply is not clear and convincing evidence of what Shirley meant by "more." Indeed, Morris admitted on cross-examination that her mother

---

[*] The trial court considered Casey's actions to initially give one-third of the revocable trust to Shirley's children as corroboration of what Shirley and he intended to leave to Shirley's children. His actions, however, only shed light as to his intent. They provide no evidence as to what Shirley thought that the agreement was and therefore cannot be considered clear and convincing evidence of the terms of the agreement between Shirley and Casey.

10

never told her that Casey would divide his estate such that one-third went to her and her sisters and two-thirds went to his children, and Gregg indicated that her mother never discussed a one-third "widow's share" with her.  Therefore, the evidence of a statement referring to a "widow's third" even when combined with Casey's actions does not establish an agreement between Casey and Shirley that her children would receive one-third of the estate.  Thus, as in <u>Blincoe</u>, it cannot be said that there is clear and convincing evidence of the specific terms of what Casey and Shirley contracted to leave to Shirley's children and, as such, the trial court's decision is without sufficient evidence to support it.  <u>See</u> Code § 8.01-680.

III.  CONCLUSION

Because the record lacks clear and convincing evidence as to the terms of the agreement between Casey and Shirley, we will reverse the judgment of the trial court holding that a contract existed between Shirley and Casey.  We will also vacate the damages awarded to Morris.

<u>Reversed and final judgment.</u>

11